## BRAINARD *v.* BUCK.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 110.   Argued January 15, 16, 1902.—Decided February 24, 1902.

The court below had power to authorize the amendment made to the bill.
It is the settled doctrine of this court that the concurrent decisions of two courts upon a question of fact will be followed, unless shown to be clearly erroneous; and in this case, after examining the evidence, it seems to this court that the findings of the court below were justified by it: and that they established that a trust resulted in favor of Buck.

THE appellants seek a review in this court of the judgment of the Court of Appeals of the District of Columbia, in this case, affirming a judgment of the Supreme Court of the District enjoining the appellants from the further prosecution of an action of ejectment brought by them against appellee Coleman in the Supreme Court of the District, to recover a one fifth interest in a house and lot in the city of Washington, in the possession of Coleman as tenant of appellee, Leffert L. Buck, who claims to be the owner thereof.   The appellees, Buck and Coleman, commenced this suit in April, 1898, and in their bill of complaint they alleged the bringing of the action of ejectment on or about July 26, 1897, by William H. Brainard, as one of the heirs of his brother, the late Charles F. Brainard, to recover an undivided one fifth interest in the real estate mentioned. The bill further alleged that the complainant Buck was the brother of one Cornelia A. Brainard, whose husband was Charles F. Brainard, both of whom lived in the city of Washington up to the time of the death of Charles on May 13, 1881, and the

widow thereafter continued to live in that city until her death on March 31, 1892. On June 12, 1872, Charles F. Brainard, the husband, made and executed his last will and testament, by which he devised and bequeathed to his wife all of his property of every kind and description for her own use and benefit. Afterwards and on July 18, 1879, there was conveyed to Charles F. Brainard by deed the premises in question. After the death of Charles F. Brainard and on March 31, 1882, his widow, by deed, duly conveyed her title to the premises to her brother, the complainant Buck. The bill then contained the following averments:

"8. The plaintiffs further show that the plaintiff, Leffert L. Buck, was the brother of the said Cornelia A. Brainard, and that her husband, the said Charles F. Brainard, was in his lifetime employed as a clerk in the Treasury Department; that he had little or no means of support outside of the salary which he received, and that the plaintiff, Leffert L. Buck, being willing to aid and assist his sister, and being solicited by her and her husband so to do, furnished and advanced the money to pay for the said property and premises first above described; that the said premises were purchased with money so advanced by the said plaintiff, L. L. Buck, in part directly to the said Brainard to pay for and on account of said property, and in part to the wife of the said Brainard, and in part in taking up and paying encumbrances which had been put upon said property for the purchase price thereof; that said money was so advanced and said property purchased for the sole and only purpose of giving to the said Cornelia A. Brainard, the sister of the said L. L. Buck, a home, and that it was so understood by the said Brainard at the time of said purchase; that the said property was conveyed to the said Brainard instead of to his wife for the reason that prior to said conveyance the said Brainard had executed his will, by which said will he had devised and bequeathed to his said wife all of his property of every kind, and it was understood and believed by the said Brainard and his wife that if she should survive him the property would descend to her, and that in event she should not survive him, her said husband, she would have a home on said property during her lifetime,

and that during said period said Brainard should hold the title to said property as trustee for said plaintiff, Leffert L. Buck."

The bill then set forth the names of the surviving heirs at law of Charles F. Brainard, and averred that some of them had quitclaimed the property to the plaintiff Buck. It is also averred that from the time of the death of Charles F. Brainard his widow lived in the house, and that she conveyed the premises to Buck by deed on March 31, 1882, and that he believed that the legal title was in him until the commencement of the ejectment suit, when he was advised that the will of Charles F. Brainard did not convey the property to his sister for the reason that it was acquired by Brainard after the execution of the will, which did not operate to convey after-acquired property.

For relief, the bill asked that the plaintiffs in the action of ejectment might be perpetually enjoined from further prosecuting the same, and that it might be declared that the land in question was charged with a trust in favor of, and ought to be held for, the use and benefit of the plaintiff Buck, and that the defendants, or such of them as should appear to have the legal title to the lands, should be decreed to convey such legal title free and clear of all encumbrances done or suffered by them or any or either of them unto the plaintiff Buck.

The defendant William H. Brainard demurred to the bill on the ground, among others, that the promise set forth in the bill was not in writing or signed by the deceased, Charles F. Brainard, and was within the meaning of the statute for the prevention of frauds and perjuries; also that Buck had been guilty of gross and inexcusable laches in bringing his suit.

The demurrer was sustained with leave to the plaintiffs to amend. Pursuant to such leave the plaintiff served an amended bill, which was a full and complete bill, taking the place of the original, and restated all the facts set forth in the original bill, but left out the above quoted eighth paragraph. The complainants in the ninth, tenth, eleventh and twelfth paragraphs of the amended bill made the following averments:

"9. That from March 12, 1875, until June 3, 1880, the said plaintiff, Leffert L. Buck, sent to the said Charles F. Brainard, for investment as agent for him, the said Leffert L. Buck, vari-

ous sums of money—the particular amounts of which, and the dates at which they were received by said Charles F. Brainard, deceased, are stated in 'Exhibit D,' hereto annexed—and authorized the said Charles F. Brainard, as agent for him, the said Leffert L. Buck, to invest the same in real estate, bonds and securities in the city of Washington; that on or about the 18th day of July, 1879, the said Charles F. Brainard purchased the said property and premises hereinbefore described for the sum of $6350, and paid on said purchase price the sum of $2550 out of the moneys so sent to him for investment by the said plaintiff, Leffert L. Buck, as aforesaid; that upon said purchase the said Charles F. Brainard took the deed of said property to himself without the knowledge, consent or authority of said plaintiff so to do; that said deed is the same deed hereinbefore mentioned as 'Exhibit B;' that thereafter and on or about March 12, 1880, said Charles F. Brainard made a further payment of $1266.66 on said property out of said moneys so sent to him for investment by said plaintiff, Leffert L. Buck, as aforesaid; that on the 8th day of June, 1880, there still remained in the hands of said Charles F. Brainard out of the said moneys so received by him for investment as agent for the said plaintiff, Leffert L. Buck, the sum of $793.58, no part of which has ever been repaid to or received by said plaintiff; that on or about the 25th day of July, 1879, said Charles F. Brainard executed to John F. Waggaman and James A. Harban, trustees, a deed of trust on said property to secure payment of the balance of the purchase money then unpaid thereon; and that said deed of trust was executed without the knowledge, consent or authority of said plaintiff, Leffert L. Buck; that after the 8th day of June, 1880, and before his death, the said Charles F. Brainard made further payments on said property, not exceeding in amount the sum of $650, out of the said moneys so received by him from said plaintiff for investment as aforesaid, the particular dates of which payments plaintiffs are unable more definitely at this time to state, for the reason that the books and accounts of the Western Building Association, to which said payments were made, have been destroyed.

" 10. That after the death of the said Charles Brainard the plaintiff Leffert L. Buck was informed by his said sister, Cornelia A. Brainard, that she held the legal title to said property under the last will and testament of her said husband, which is the instrument hereinbefore mentioned as 'Exhibit A,' and that there remained unpaid upon said trust deed the sum of $1971.81; that thereupon, and on or about the 17th day of March, 1882, said plaintiff, Leffert L. Buck, paid the balance due upon said trust deed, which was thereupon discharged, to wit, the sum $1971.81; and thereafter, and on the 31st day of March, 1882, the said Cornelia A. Brainard conveyed the said property to him by the deed referred to as 'Exhibit C,' and the said plaintiff, Leffert L. Buck, thereupon and on that day entered into and has ever since remained in undisturbed possession of said premises.

" 11. And the plaintiffs further show that all of the moneys that were paid for the purchase of said property, including the whole consideration thereof, were paid by the plaintiff Leffert L. Buck.

" 12. And the plaintiffs further show that not until after the said action at law No. 41,274, which is the suit of said William H. Brainard against James Coleman, had been brought had the plaintiff Leffert L. Buck any information that the legal title to said premises did not pass to his sister, the said Cornelia A. Brainard, under the will of her said husband, Charles F. Brainard."

The defendants demurred to this amended bill on the same grounds stated in the demurrer to the original bill, and also on the ground that a new and different cause of action had been set up in the amended bill from the one in the original bill. The demurrer was overruled, and the defendants thereupon answered, in which among other things, they denied complainants' allegation as to the payments for the premises by Buck, and averred that the purchase money for the premises had been paid out of Charles F. Brainard's own funds in cash or by his notes secured by deed of trust, which notes were subsequently paid by Brainard.

Upon the trial there was a final decree in favor of the complainants, and the defendants were enjoined from prosecuting

the action at law, and they were directed to convey, quitclaim and release the real estate unto the complainant Buck, and in default of their doing so it was adjudged that the decree then given should operate and stand as such conveyance, quitclaim and release.

*Mr. Leo Simmons* and *Mr. Hugh T. Taggart* for appellants. *Mr. D. W. Baker* was on their brief.

*Mr. E. V. Brookshire* for appellees.

*Mr. James Coleman* filed a brief for Buck, appellee.

*Mr. Nelson L. Robinson* filed a brief for appellees.

MR. JUSTICE PECKHAM, after stating the above facts, delivered the opinion of the court.

The appellants insist that the Supreme Court of the District had no power to authorize the amendment which was made by the appellees to their original bill in this suit, because, as they assert, the cause of action set forth in the amendment is new, different and distinct from that set forth in the original bill, and that therefore the demurrer to the amended bill should have been sustained.

We fully agree with the courts below in holding that the allowance of the amendment was within the discretion of the court, and that the demurrer on the ground stated was properly overruled. The case comes within the principle of *Jones* v. *Van Doren*, 130 U. S. 684, 690. The purpose in both bills was the same, to establish a resulting trust in favor of the complainant Buck on account of the transactions set forth in the bills, and while the reasons are stated more fully in the amended bill and in some respects differently from those in the original bill, yet the purpose is the same, arising from the same transactions and based upon the same general rule of law applicable to resulting trusts.

Upon the merits of the case, the two courts below have come

to the same conclusion. The general finding of the trial court in favor of the complainants was a finding in their favor of all the material facts alleged in the amended bill, and those facts have been repeated and affirmed in the Court of Appeals, and we are now asked to review and reverse those findings upon the testimony contained in the record. It ought not to be done in this case. It is the settled doctrine of this court that the concurrent decisions of two courts upon a question of fact will be followed, unless shown to be clearly erroneous. *The Carib Prince*, 170 U. S. 655, 658, and cases there cited. After examining the evidence in the case, we are not convinced that the findings of the court below were erroneous, but on the contrary it seems to us that they are justified by the evidence.

In regard to the evidence on the part of the complainants given on the trial, defendants assert it to be different from and inconsistent with the statements of fact contained in the amended bill, but a careful perusal of the whole evidence fails to convince us that there exists any such real and material inconsistency, but on the contrary the evidence substantially corroborates and justifies the averments of the amended bill.

The account book of the deceased Brainard was put in evidence, and some criticism has been made by counsel for the defendants in regard to the manner in which the deceased kept his accounts, as evidenced in that book, and some faint claim seems to have been made that the book showed that moneys had been sent by Brainard to Buck instead of the reverse, as claimed by Buck. This criticism arises on account of the position of the words "Dr." and "Cr." with regard to the statement of the account between the two people. However, a perusal of the accounts in the book, taken in connection with the statement of the account between the parties made by Brainard in his lifetime and in his handwriting and given to complainant Buck, shows beyond any controversy that the moneys were advanced by Buck to Brainard and not the reverse. There is really no contradiction of the evidence on the part of the complainants that it was the money of Buck, and his alone, which paid for the property in question.

From the evidence which was taken upon the trial and upon

which the trial court gave judgment in favor of the complainants, the Court of Appeals itself found the facts similar to the averments in the amended bill, and stated them as follows, 16 D. C. App. 595:

"Leffert L. Buck was a civil engineer and a bachelor. His residence was in the city of New York; but his professional engagements called him to different parts of the world. He testified that he went to Peru in 1875, and before leaving sent about $200 to Brainard for investment. He continued to send sums of money from time to time from 1877 to 1880, and during the latter year. Brainard invested from time to time in bonds which he sold for reinvestment.

"Brainard kept an account book, which has been preserved, and the entries therein of money received from Buck correspond with a statement rendered to the latter and produced by him in evidence.

"Buck testified that he suggested the joint purchase of the house and lot in controversy, which Brainard wrote him could be had for $6350. Brainard made the purchase at that price on July 18, 1879, making a cash payment thereon of $2550 with Buck's money, as the account book shows. The remainder was raised by mortgage. The account book, under the same date, shows the charge of the cost of recording the deed, and of insurance against Buck. The deed was made to Brainard.

"Buck testified that early in 1880, he learned that the deed was in the name of Brainard alone, and suggested to the latter to convey to him and he would pay the balance, and Brainard and wife could occupy the house as a home. Brainard was then in bad health. He did not wish to make the transfer then, saying that when he recovered he would be able to go on and pay the balance on the property, and would also be able to pay for Buck's half, and he thought that better than to go to the expense of making two transfers. He said that, in any event, the property would go to his wife with everything that he had in case of his death. He was sick and nervous, and Buck did not press the matter. Brainard died of Bright's disease, and was suffering therefrom at the time, though it was not then known.

" On March 12, 1880, he paid $1266.66 on the mortgage with Buck's money in his hands.

" Some time after that Brainard made a statement in writing of the cost of the property, showing the payments made with Buck's money, and stating therein that he proposed to convey to Buck a half interest in the property, and to give him his note for the excess paid over one half. He expected to be able to pay back to Buck this excess and also to finish paying for the property.

" Buck testified that he did not agree to this, but let matters run on because of Brainard's nervous condition, and because he expected the will of Brainard would vest the legal title in his sister. Brainard died without completing the payment for the property.

" Mrs. Brainard remained in possession, claiming under the will, but conveyed the title to Buck, who paid the last mortgage, amounting to nearly $2000. Mrs. Brainard made her home there until she died on March 31, 1892. Buck was frequently there, and contributed to her support. When she died he leased the property and has since collected the rents, kept the property in repair, and paid all the taxes.

" Without going into further details, it is sufficient to say that the evidence on behalf of Buck, corroborated on all the material points by the entries in the book of Brainard, shows clearly that the purchase of the property was made with his money in the hands of Brainard for investment ; and that Brainard was his agent and trustee and not his debtor for money lent for the purpose. From these facts it is clear that a trust resulted in favor of Buck, which entitled him to a conveyance of the legal title. 2 Pom. Eq. sec. 1037."

We think the law in this respect was correctly stated by the court below.

The defendants also rely upon the defence of laches on the part of the complainants, in that they permitted so long a time to elapse after they knew that the title was in the name of Brainard.

We also agree with the court below that this defence is not sustained. When the knowledge came to the complainant

Buck that the title was in Brainard, Buck asked him to transfer it to the complainant, and stated that he (Buck) would pay the balance of the purchase money unpaid on the premises. This Brainard disliked to do, and wanted Buck to wait and see if he (Brainard) could not make payments, and thus keep the house for himself. During this time Brainard was ill, and, as it subsequently appeared, was then suffering from Bright's disease, although he did not then know the cause of his illness, and the complainant says that he acquiesced because he did not wish to worry Brainard, and so the matter ran on for a little while, and was terminated by the sudden death of Brainard without anything having been done.

This did not amount to any settlement, nor did it in any way bar the rights otherwise existing in favor of the complainant Buck. It was a mere hope expressed on the part of Brainard that he might thereafter be able to pay for the house and a passive acquiescence on the part of the complainant that such effort might be made. As is said, nothing was ever in fact done, and no real alteration was ever made in the position of the two parties.

We have then the conditions of the title taken to the property in the name of Brainard, unknown to the complainant at the time, and the money furnished by Buck to Brainard as his agent, and put into the purchase of the house and lot. Subsequently and a short time before the death of Brainard, Buck discovers the fact, and Brainard and his wife are then living on the premises. He knows that Brainard has made a will in favor of his wife, for he has been told by Brainard that upon his death everything was to go to her, and wants his sister to have a home, and is entirely satisfied in that way. He believed that the property would pass to the wife by the will in case of the death of Brainard. After Brainard's death, his widow (complainant's sister) remains in the house, and Buck contributes to her support while living there. She conveys the premises to him by deed, and he supposed that he thereby acquired full title to the premises, and paid the balance of the purchase money. After the death of his sister he takes possession of the property, and has continued in possession ever since, and it

was not until after the commencement of the action of eject-
ment that the complainant Buck had any knowledge that the
legal title to the premises did not pass to his sister under the
will of her husband, because it was acquired subsequently to
that will. That action of ejectment was commenced in 1897,
and this bill was filed April 15, 1898. These facts, we think,
are sufficient to excuse all the delay that has been shown to
exist in this case. It is covered by the principles laid down in
*Ruckman* v. *Cory*, 129 U. S. 387, 389, and *Townsend* v. *Van-
derwerker*, 160 U. S. 171, 185, 186.

Upon this subject we fully agree with what was said by Mr.
Justice Shepard, in delivering the opinion in this case in the
Court of Appeals, as follows:

"Buck entertained affection for and had perfect confidence in
Brainard. He was anxious to secure a comfortable home for
his sister. Brainard became seriously ill, and his condition was
such that Buck would not aggravate it by importunity. Be-
sides, he was assured that Brainard would devise the property
to his sister. In fact, Brainard had made, and executed with
due formality, a will leaving everything to his wife. This will
was then, and until the institution of the action of ejectment,
supposed to operate a conveyance of the property in question.
Buck, so believing, took a conveyance from his sister, who was
childless, and paid off the last encumbrance. He suffered her
to occupy the house until her death. In the meantime, none
of the heirs-at-law of Brainard made any claim to the property.
Their apparent acquiescence tended to confirm Buck, who was
in actual possession all of the time, in the belief that his title
was perfect. There was nothing, therefore, to suggest the
necessity or importance of resorting to a court of equity for the
confirmation of that title, until the institution of the action of
ejectment. When roused to action, he was diligent in taking
it. This long, undisturbed possession, under a title supposed to
be perfect, presents a stronger excuse for delay, also, than that
held sufficient in *Ruckman* v. *Cory, supra*, wherein it was said:
'Nor has the plaintiff been guilty of any such laches as would
close the doors of a court of equity against him. He was in
the peaceful occupancy of the premises for some years prior to

any assertion of title upon the part of the defendant under the deed of 1872. If he had not been all the time in the possession of the premises, controlling them as if he were the absolute owner, the question of laches might be a more serious one than it is. The bringing of the action of ejectment was, so far as the record shows, the first notice he had of the necessity of legal proceedings for his protection against the legal title held by the defendant. As proceedings to that end were not unreasonably delayed, we do not perceive that laches can be imputed to him. Laches are rather to be imputed to the defendant, who, although claiming to have been the absolute owner of the lands since 1862, took no action against the plaintiff until the ejectment suit was instituted.' "

The last objection made by the appellants consists in an assertion that in no possible view of the evidence, even upon a proper bill, could Buck be properly held to be entitled as a matter of equitable right to more than a decree for an accounting, wherein he should be credited with advances of money made by him to Brainard in the latter's lifetime and invested by the latter in the property, and further credited with the sum paid by him after Brainard's death in the settlement of Brainard's debt to the building association secured by the deed of trust, (thus subrogating him to the rights of the association,) and charged with rents and other proper offsets and with an equitable lien on the property for the balance thus found to be due, if any.

Taking the facts as found by the courts below, this claim is not well founded. The moneys of the complainant Buck were used by his agent Brainard in the purchase of the premises and at the time of the death of the agent the whole purchase price had not been paid. After his death that balance was paid by Buck, who thus paid every dollar that has gone into the purchase price of the premises, and the substance of the whole evidence tends directly to show that while the funds were used by the agent with the assent of his principal, Buck, the taking of the title in Brainard's name was unknown to his principal. Buck's money, and Buck's money alone, has been paid for the whole premises, and there is neither equity nor justice in refus-

ing him the legal title to the property purchased with his own money.

The judgment should be

*Affirmed.*