64 F.Supp. 64 (1945)
In re MISSOURI PAC. R. CO.
No. 6935.
District Court, E. D. Missouri, E. D.
December 21, 1945.
*65 *66 Russell L. Dearmont and Thos. T. Railey, both of St. Louis, Mo., for Guy A. Thompson, trustee, Missouri Pac. R. Co.
Marion B. Pierce, of New York City, and Allen L. Oliver, of Cape Girardeau, Mo., for Missouri Pac. R. Co., debtor.
Luther M. Walter, of Chicago, Ill. (Walter, Burchmore & Belnap, of Chicago, Ill., of counsel), for Protective Committee for Holders of Common Stock of Missouri Pac. R. Co.
Richard I. Gottlieb, of Boston, Mass., for Protective Committee for Holders of Preferred Stock of Missouri Pac. R. Co.
Cadwalader, Wickhersham & Taft, of New York City, and Lowenhaupt, Waite, Chasnoff & Stolar, of St. Louis, Mo. (W. Lloyd Kitchel and Charles W. McConaughy, both of New York City, and Jacob Chasnoff, of St. Louis, Mo., of counsel), for Group of Institutional Holders of First and Refunding Mortgage 5% Gold Bonds of Missouri Pac. R. Co.
Cahill, Gordon, Zachry & Reindel, of New York City, and Carter, Bull & Garstang, of St. Louis, Mo., for Chemical Bank & Trust Company, trustee under Missouri Pac. R. Co. 5¼% Secured Serial Mortgage.
Shearman & Sterling, of New York City (Sanford H. E. Freund, of New York City, of counsel), for Bondholders Protective Committee, Missouri Pac. R. Co. General Mortgage.
Chadbourne, Wallace, Parke & Whiteside, of New York City, for Manufacturers Trust Co., corporate trustee, Missouri Pac. R. Co. First and Refunding Mortgage.
Martin, Peper & Martin, of St. Louis, Mo., for Presley W. Edwards, individual trustee, Missouri Pac. R. Co. First and Refunding Mortgage.
Kadel & Hoffmann, of New York City, for Continental Bank & Trust Co. of New York, corporate trustee, Missouri Pac. R. Co. General Mortgage.
Root, Clark, Buckner & Ballantine, of New York City (William P. Palmer, of New York City, of counsel), for Commercial National Bank & Trust Co. of New York, successor trustee, Missouri Pac. R. Co. 20-yr. 5½% Convertible Gold Bond Indenture.
Edwin J. Bean, of St. Louis, Mo., and Harry Kirshbaum, of New York City, for Missouri Pac. R. Co. Convertible Mortgage Bondholders Group.
Irving Rand, of Portland, Or., and Blayney, Barrett, Bedal, Cook & Fairfield, of St. Louis, Mo., for John M. Balliet, Appleton, Wis., as Holder of Missouri Pac. 5½% Convertible Bonds and other securities.
Donovan, Leisure, Newton & Lumbard, of New York City (George S. Leisure and David Teitelbaum, both of New York City, of counsel), for Alleghany Corporation.
William H. Biggs, of St. Louis, Mo. and Maxwell Brandwen, of New York City, for Andrew W. Comstock, for himself and others as owners and holders of Missouri Pac. Secured Serial 5¼% Gold Bonds.
James L. Homire, Emmet McCaffery, and W. Meade Fletcher, Jr., all of Washington, D. C., and Hennings, Green, Henry & Evans, of St. Louis, Mo., for Reconstruction Finance Corporation.
B. M. Anderson, of Hartford, Conn., for Connecticut General Life Ins. Co.
Wm. J. Kane, of Baltimore, Md., for Railroad Credit Corporation.
W. A. Northcutt, of Louisville, Ky., for Louisville & Nashville R. Co., holder of Cairo & Thebes Mortgage Bonds.
A. L. Rittenberg, of Chicago, Ill., for M. Ernest Greenebaum, Jr., co-trustee, Plaza-Olive Building Mortgage, and for Protective Committee for Holders of Plaza-Olive Building Mortgage Bonds.
Oliver & Donnally, of Washington, D. C., for Savings Bank Trust Company.
*67 Cravath, Swaine & Moore, of New York City, and S. Mayner Wallace, of St. Louis, Mo., for Bondholders Protective Committee for Holders of First Mortgage and Income Bonds of New Orleans, Texas & Mexico Ry. Co.
Fordyce, White, Mayne, Williams & Hartman, of St. Louis, Mo., and Davies, Auerbach, Cornell & Hardy, of New York City, for Irving Trust Co., trustee under First Mortgage of New Orleans, Texas & Mexico Ry. Co.
Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City, for Guaranty Trust Co. of New York, trustee under (a) New Orleans, Texas & Mexico Ry. Co. Income Bond Indenture, and (b) Missouri Pac. R. Corporation in Nebraska Mortgage.
Alexander & Green, of New York City, for Bankers Trust Co., corporate trustee, St. Louis, Iron Mountain & Southern Ry. Co., River & Gulf Divisions, First Mortgage, and for Bondholders Protective Committee for Holders of said Bonds.
Rathbone, Perry, Kelley & Drye, of New York City, for Central Hanover Bank & Trust Co., trustee under Central Branch, Union Pacific Mortgage.
Bryan, Cave, McPheeters & McRoberts, of St. Louis, Mo., for St. Louis Union Trust Co., trustee for Bondholders Protective Committee for Holders of Little Rock & Hot Springs Western R. Co. First Mortgage 4% Gold Bonds.
Milbank, Tweed & Hope and Hugh L. M. Cole, all of New York City, for City Bank Farmers Trust Co., trustee, International-Great Northern R. Co. First Mortgage.
Nagel, Kirby, Orrick & Shepley, of St. Louis, Mo., for J. P. Morgan & Co., Inc., City Bank Farmers Trust Co., trustee, International-Great Northern R. Co. First Mortgage, and Manufacturers Trust Co., Corporate trustee, Missouri Pac. R. Co. First and Refunding Mortgage.
Willkie, Owen, Otis, Farr & Gallagher, of New York City, for New York Trust Co., trustee: (a) International-Great Northern R. Co. Adjustment Mortgage, (b) Beaumont, Sour Lake & Western Ry. Co. First Mortgage, and (c) Orange & Northwestern R. Co. First Mortgage.
Everett Paul Griffin, of St. Louis, Mo., Edward F. Colladay, of Washington, D. C., and Kenneth McEwen, of New York City, for Protective Committee for Holders of International-Great Northern R. Co. First Mortgage Bonds.
Mulholland, Robie & McEwen, of Toledo, Ohio, for Railway Labor Executives' Association.
MOORE, District Judge.
The matter of the approval of a plan of reorganization for the principal debtors, the Missouri Pacific Railroad Company, the New Orleans, Texas & Mexico Railway Company and the International-Great Northern Railroad Company, and their various subsidiary companies (except the Missouri-Illinois Railroad Company) has been the subject of two prior opinions of this Court. See In re Missouri Pacific Railroad Company, 39 F.Supp. 436 and Id., 50 F.Supp. 936. Since the date of the last opinion by this Court in July of 1943 this matter has been back to the Interstate Commerce Commission for further consideration, and after hearings the Commission has forwarded its Supplemental Report and Order of July 4, 1944, and its Third Supplemental Report and Order of October 9, 1944, containing a revised plan of reorganization. Subsequently, pursuant to direction of this Court, all parties in interest have been given the opportunity to file objections, and the following have availed themselves thereof:
(1) Missouri Pacific Railroad Company, Debtor;
(2) Protective Committee for holders of Common Stock of Missouri Pacific Railroad Company;
(3) Protective Committee for Missouri Pacific Preferred Stockholders;
(4) Group of individual owners and holders of 5½%, twenty-year Convertible Bonds, Class "A," of Missouri Pacific Railroad Company;
(5) John M. Balliet, as holder of Missouri Pacific 5½% Convertible Bonds and other securities;
(6) St. Louis Union Trust Company, Trustee for, and Roland C. Behrens, et al., as Committee for holders of Little Rock & Hot Springs Western Railroad Company First Mortgage 4% Gold Bonds;
(7) Irving Trust Company, Trustee under the N. O. T. & M. Mortgage;
(8) Protective Committee for the holders of First Mortgage Bonds of International-Great Northern Railroad Company, a debtor herein;
*68 (9) Missouri Pacific Railroad Company 5¼% Serial Bondholders' Committee; and
(10) Andrew W. Comstock, holder of 5¼% Secured Serial Gold Bonds of Missouri Pacific Railroad Company.
By the first of the above mentioned opinions (39 F.Supp. 436) a plan of reorganization certified in the Commission's Report and Order of January 10, 1940, and its Supplemental Report and Order of April 9, 1940, was approved by this Court. Appeals were thereafter taken to the 8th Circuit Court of Appeals, but pending appeal the 1940 Plan was submitted to vote of creditors, which resulted in its rejection by five junior and senior classes of creditors. No appellate ruling was thereafter had on the merits, but, due to certain Supreme Court decisions, the appeals were remanded May 8, 1943. Further objections were filed and heard, and this Court then referred the matter to the Commission (50 F.Supp. 936) to allow its further consideration of the questions whether the Plan gave senior creditors complete compensation for their loss of seniority and whether, in view of changed conditions since that Plan's formulation, any alterations should be made. The Commission held hearings and ultimately approved, with slight modifications, a plan known as "the compromise plan". This compromise plan was jointly proposed to the Commission by the Protective Committee for the First and Refunding Mortgage 5% Bonds of the Missouri Pacific; the Committee for the N. O. T. & M. First Mortgage and Income Bonds; the Protective Committee for the Missouri Pacific General Mortgage 4% Bonds; the Missouri Pacific Railroad Company, Debtor; and the Alleghany Corporation, owning approximately one-fourth of the Missouri Pacific Convertible Bonds, some preferred stock and a large portion of the common stock. The Commission's Report further recites that the Plan also had the agreement of a bank syndicate holding a collateral security claim against the Missouri Pacific, and was generally supported by various other interests.
The plan approved by the Commission in its Order of October 9, 1944, is essentially the "compromise plan", with certain alterations, and is still substantially the plan previously approved by this Court in 1941. The Commission has summarized its major modifications of the "compromise plan" as follows:
"(a) The effective date is changed from January 1, 1940, to January 1, 1943, with provisions for change to a later date or dates under certain conditions.
"(b) There is distributed among senior classes of creditors the sum of $30,574,095 of cash, the greater part of which is allotted in compromise settlements of parts of their claims for accrued and unpaid interest. Optional offers of additional reorganization securities are provided for senior creditors not accepting the compromise cash offers.
"(c) The parts of the claims of Reconstruction Finance Corporation and of J. P. Morgan and affiliated banks representing interest accrued and unpaid on their claims since the date of the filing by the debtors of their petitions in bankruptcy are settled with cash on a basis of a 4 per cent per annum interest rate instead of 3½ percent as provided in the `compromise plan.' The other compromise cash offers of the `compromise plan' are not changed.
"(d) Provision is made for the distribution of cash among creditors prior to consummation of the plan.
"(e) Warrants entitling the holders thereof, for a period of 10 years after consummation of the plan, to purchase new class-B no-par common stock at a price of $100 per share, are offered junior creditors (and stockholders of the New Orleans, Texas & Mexico Railway Company) in addition to the reorganization securities to which such creditors and stockholders are entitled under the plan. Provisions of the compromise plan for issue of warrants to Missouri Pacific Railroad Company preferred and common stockholders are not approved.
"(f) The duration of the voting trust is decreased from 10 years, as in the Commission and compromise plans, to 5 years and the method of selection of the voting trustees in such plans is changed to provide that the court shall designate them.
"(g) There are various other minor changes from the former Commission's and the compromise plans.
"(h) The provisions of both plans for selection of the five reorganization managers, and the first board of directors of the reorganized company are changed."
The Commission Report contains the following comparative tables, which further amplify the alterations it has made:

*69
 Capitalization
 Former
 Plan as Commission
 Modified Plan
Fixed-interest debt
 Equip. obligations, undisturbed......... $ 15,755,000 $ 15,755,000[2]
 Plaza-Ol. Bldg. 1st-mtg. bonds......... 591,000 591,000[2]
 10-yr. collateral 3½% notes..... 10,352,000 14,433,500
 First-mtg. bonds....................... 166,809,000 158,700,500
 ____________ ____________
 Total .............................. 193,507,000 189,480,000
Contingent-interest debt
 General-mortgage bonds .............. 159,175,000 120,661,000
 ____________ ___________
Total Debt .............................. 352,682,000 310,141,000
Stock
 Preferred stock ....................... 57,717,000 115,501,000
 Common stock .......................... 150,081,000 136,756,400
 ____________ ____________
 Total stock ......................... 207,798,000 252,257,400
 Total capitalization .................. 560,480,000[1] 562,398,400

 Annual Charges
 Former
 Plan as Commission
 Modified Plan
Fixed interest .......................... $ 7,289,735 $ 7,186,137
Contingent Charges
 Capital expend. fund ................... None (due to 580,000
 sufficiency of (excess over rate
 depreciation provided by
 charges) modified plan)
 First-Mtg. Sink. Fund .................. 417,023 None
 Contingent interest .................... 7,367,202 5,327,940
 Contingent sinking funds ............... 795,876 603,305
 ___________ ____________
 Total contingent chgs. ............... 8,580,101 6,511,245
 ___________ ____________
Total fixed and contingent charges ....... 15,869,836 13,697,382
Dividends on preferred stock ............. 2,885,841 5,775,050
 ____________ _________
 Total annual charges prior to common
 stock dividends ...................... 18,755,677 19,472,432

*70 In view of the present plan's similarity to the former Commission plan and the above summarization of new features, the Court does not deem it necessary to detail all its many provisions. Attached to the Commission's Supplemental Report as appendix "F" is a table showing the distribution of reorganization securities and cash, and it is hereby made a part of this opinion in further amplification. See 64 F.Supp. 79. Disputed provisions of the Plan will appear in the following consideration of the various objections.

Objections of Missouri Pacific and Stockholders.
Although separate objections have been filed by the Debtor, Missouri Pacific Railroad Company, and the Protective Committees for the common and preferred stock of that railroad, essentially all three object to the Plan on the same grounds and are, therefore, considered together. Their basis of argument, which constitutes their only objection necessitating comment, arises from the Commission's finding that the stockholders have no equity and, consequently, must be excluded from participation. They argue, however, in the alternative, saying that the Commission erred either in not allocating them certain warrants or in not allowing a greater permissible capitalization, permitting them some participation. The "compromise plan" as originally presented allocated Missouri Pacific stockholders 10-year warrants for the purchase at $100 a share of certain shares of Class "B" no-par common stock, but the Commission rejected this allocation.
The Court's attention is called to the fact that in previously referring this matter back to the Commission one of its stated reasons was to give an opportunity for reconsideration as to whether the valuations of the Debtor's properties should not be revised, in view of recent earnings and possible enhanced value of the Road. At that time this Court had no intention of giving any direction to the Commission and was solely of the opinion that since the matter was to be remanded the question of possible revaluation should be called to its attention. The Commission has given particular and painstaking re-appraisal to valuation and capitalization and, in view of the Supreme Court's ruling that the determination of the Commission in regard to valuation and new capitalization is conclusive if supported by the evidence and made in accordance with legal standards, this Court is not disposed to go further into the matter. The report of July 4, 1944, and the findings of the Commission show careful consideration and profound understanding of the problems of railroad capitalization, and the Court is completely satisfied that there has been no departure from legal standards or any disregard of proper evidence. In its brief the Debtor admits that "full opportunity fully availed of" was afforded to present evidence and that "the discussion of that evidence * * * shows that the Commission considered all of it." They object solely because the Commission did not apply proper legal tests. For this assertion the Court can find no support.
Regarding the rejection of the compromise plan's provision for warrants to stockholders, the Commission felt that, although warrants were reasonable to junior creditors to give them further opportunity for recoupment, any provision for warrants to the stockholders when their equity was extinguished would result in an increase in allowable capitalization. Further, it felt that, in view of the impossibility of providing substantial satisfaction of junior creditors within proper capitalization, it would be inequitable to offer anything at all to stockholders. The Court is in full accord on this holding, since it appears elementary and contrary to equity to give anything to stockholders so long as unsatisfied creditor claims exist. This reasoning is equally valid whether the proceeds of the warrants were to be used for any corporate purpose, as contemplated by the compromise plan, or allocated to retirement of indebtedness as is now proposed by the Debtor. The Commission's view that such warrants are unwise, because they might have a material effect upon the control of the new company also appears to be a sound reason for their exclusion.

Objections of Holders of Missouri Pacific 5½% Convertible Bonds.
A group of individual owners of 5½%, 20-year, Convertible Bonds, Class "A," of the Missouri Pacific take exception generally to the treatment accorded them, to the $100 option price for common class "B" stock, to the fact that two directors and one reorganization manager are to be appointed *71 by the Convertible Bondholders' trustee, and to the fact that the plan does not require a greater use of cash to reduce new indebtedness. They also object to the capitalization and to the voting trust, but these objections are considered elsewhere.
In the allocation made them, the Court can see no unfairness or inequity when it is considered that these Convertible Bonds are unsecured debentures and cannot be given the same class of stock as is given to securities prior in rank. They argue for an allotment of stock subject to no other common stock and yet disregard their status as unsecured debentures. Neither can the Court find any support whatever for their charge that the trustee of these bonds is dominated and unable to properly devote itself to the interests of the Convertible Bonds alone. There is no evidence in the record that since its appointment the Commercial National Bank & Trust Company of New York has in any way failed to represent impartially all holders of Convertible Bonds.
In regard to their objection that the Plan should provide further payments in cash to various creditors (and in particular for the River and Gulf Bonds) rather than granting allocations subject to the Court's making prior cash distributions, the Court finds no error in the Commission's action. The Commission desired to fix the capitalization at $560,000,000 and insure that amount as the maximum. It recognized that this Court might make cash distributions, but it further recognized that there might be an increase in equipment obligations resulting from future demand, which would result in total capitalization at the same as the maximum fixed by it. The question of whether various securities should be retired for cash is thus left to the Court, and the wisdom of such retirements can now be presented and will be disposed of by the Court at the proper time. The Court believes this provision to be a reasonable one and is not disposed to disturb it.
Finally, as to these Bondholders' objection that the option price of $100 for the new common Class "B" stock offered them under the Plan is too high, the Court is of the opinion that the Commission acted properly in fixing this value, and that the lower mean average market price between 1929 and 1933 for Debtor's stock (which is urged in support of a lower offering price) has no force. These warrants are to be given to allow some further opportunity for recoupment of investments should favorable conditions occur in the future, and are not, nor need not be, given with an absolute present intrinsic or market value. An allocation of securities of established value and an opportunity for recoupment are not one and the same thing by any means.

John M. Balliet's Objections.
John M. Balliet is, he alleges, a large individual holder of Missouri Pacific Convertible, General and First and Refunding Bonds, and also holds certain I.-G. N. Adjustment 6's. His sole objection, in which he does not stand alone, is directed to the voting trust provisions in the Plan. The Plan provides that all preferred and common stock of the reorganized company, whether provided for in the Plan or thereafter issued, is to be deposited in a voting trust, which trust is to continue for five years from the date of consummation of the Plan or until available net income shall have been sufficient for a period of three consecutive calendar years, commencing not earlier than January 1st next to date of consummation of the Plan, to provide full interest and sinking fund requirements on all outstanding General-Mortgage Bonds, Series "A" and Series "B," plus the sum of $3,600,000 per year, whichever period shall be the shorter. The three voting trustees are to be designated by the Court, and one must be a citizen of Missouri and one a citizen of Texas. Thereafter vacancies will be filled by a majority of the remaining trustees. The compromise plan contained a 10-year voting trust, in which the Court was not given the sole appointive power, but the Commission changed it because it believed that the term should be of the shortest possible duration required to accomplish the purpose of its creation and that all three of the voting trustees should be designated by this Court.
Balliet urges that this trust is not authorized under the statute, that it is an unconstitutional deprivation of property, and that it is not fair and equitable. He points out that the Plan changes his position from that of creditor to owner, and that while he is given stock, or ownership, the principal power of stock is withheld.
*72 That the Commission and this Court are empowered under the Act to provide for a voting trust, as created here, the Court does not doubt for a moment. Although it is true that the voting trust will prevent the stockholders from controlling the railroad by their votes for a period of years, and it is also true that the power to require a voting trust is not expressly granted by Section 77, Bankr.Act, 11 U.S.C.A. § 205, it appears clear to this Court that those provisions of that law which state that a plan shall include provisions modifying or altering the rights of creditors generally, or any class of them, secured or unsecured, or of stockholders, either through the issuance of new securities of any character, or otherwise, and further stating that the plan shall provide adequate means for its execution, very clearly encompasses the right to create such a trust. The stated purpose of this voting trust is to afford adequate protection for any class or classes of creditors, or stockholders, and to assure a stable, experienced and impartial management while the new company is getting on its feet. All of the powers exercisable in the formulation of a plan are certainly not specifically and expressly set down, but the general powers to provide for the execution of the plan and to alter the rights of stockholders necessarily encompass the power to withhold from stock for a reasonable time the voting privilege where greater protection to the parties concerned is thus afforded and a greater probability of the plan's success is assured. The Commission places many terms and conditions on reorganization securities, and it is difficult for this Court to see what there is unreasonable in attaching a condition to the stock. If objector's rights have not been violated by the entire proceeding why should one single condition attached to the stock constitute a deprivation of due process?
Objector assumes that he is in the position of one who has been given stock and then had its voting right withdrawn without just compensation. That is not the case. Actually, as a part of a fair and equitable allocation, he is to be allotted stock with no voting right up to five years. He further assumes that the removal of the voting power from stockholders is inequitable because the management will be persons not selected by the stockholders who may not make wise selections of the directors. He points out that the only qualifications of the trustees is that one be a citizen of Missouri and one of Texas, and from that argues that no assurance is afforded that the directors selected will act in the general interest without allegiance to any particular class of security holders, or will act in any manner other than in the selfish interest of those appointing them. It appears to the Court that objector overlooks the fact that all trustees will be initially selected by this Court. It would appear that there is far less probability of an allegiance-bound board of directors being produced through voting trustees chosen with care by this Court than were the stockholders themselves allowed at the very inception of the Plan to choose a Board. Therefore, the Court rules that the voting trust provision to be constitutional, within the powers conferred by the Act, and fair, equitable and reasonable in all respects.

Objections of Little Rock & Hot Springs Bondholders.
The trustee and committee for the Little Rock & Hot Springs Western Railroad Company bonds have filed objections to the treatment afforded them and to the provisions for judicial sale of the properties. After study of the same, the Court is of the opinion that these objections differ in no respect from those previously urged and overruled in 1940, and in view of the fact that these bondholders' position is improved in the new plan, these objections will be overruled for the reasons previously assigned.

Request of N. O. T. & M. 1st Mortgage Trustee.
The Irving Trust Company, Trustee under the NOT&M first mortgage, has filed a request for clarification of parts of paragraph A of the Plan relating to cash distributions and a statement of position, from which document it appears that it is not now opposing the Plan. Inasmuch as an interpretation of the Plan and not an objection is here involved, the Court is of the opinion that this is not the proper time to dispose of the matter. Under the general power to construe given the Court, the questions raised by the Irving Trust may be considered at a later date.

*73 I.-G. N. 1st Mortgage Protective Committee Objections.
Concerning the objections, 51 in number, filed by the Protective Committee for the holders of the First Mortgage Bonds of the International-Great Northern, said objections, although too numerous to detail, are principally directed against the capitalization of the new company and the treatment afforded to these bonds. Relative to the treatment of these bondholders, the Court is of the opinion that the allocation made them is in all respects fair and equitable, especially in light of the fact that their position is considerably improved over that afforded them by the Commission plan of 1940. Under the 1940 Plan these bondholders were given 29.5% of their claim in Series "A," General Mortgage, Cumulative Income Bonds of the par value of $11,471,000; 18.6% in Series "B," General Mortgage, Convertible Income Bonds in the principal amount of $7,217,000; 11% in Prior Preferred, $100 par value, 5% Stock in the principal amount of $4,256,000; 14.9% in Second Preferred Stock at a value of $4,779,000; and 26% in no Par Value Common Stock to be taken at $100 a share, or $10,089,500. The new plan makes the following provision of allocation to these bonds:
"The holders of International first-mortgage bonds of the respective series shall receive for each $1,000 bond and unpaid interest thereon to January 1, 1943, approximately the following:

 Common-stock
 First-mortgage General-mortgage class A
 bonds ------bonds----- Preferred (No. of
 Series C Series A Series B stock shares)
Series A ....... $123 $542 $153 $244 5.03
Series B ....... 116 512 145 231 4.73
Series C ....... 116 512 145 231 4.73

"The holders of the said bonds of the respective series shall be entitled at their election to receive, in lieu of the common stock, class A, allocated to them as above set forth, cash per $1000 bonds as follows: Series A $130.49, series B $122.63, and Series C $122.63."
In light of the Court's previous approval of their treatment and the statements made in its 1941 opinion, the Court can see no profit in further discussion of these objections.
On the question of capitalization, these bondholders raise one question different from that already covered by this opinion. They point out that the Interstate Commerce Commission in its findings determined separately the following capitalizations for each of the three main railroads comprising the System; Missouri Pacific $463,000,000; N. O. T. & M., $67,000,000 and I.-G. N., $50,000,000. The total of these three capitalizations would be $580,000,000, but the Commission set a System capitalization of $560,000,000, or $20,000,000 less than the aggregate. This, they allege and argue, constitutes a deprivation of $20,000,000 of property to the creditors and is in violation of the statute and of the Constitution.
The Commission, however, fully explained this elimination in its report when it said:
"One of the parties to the proceedings contends that the duplications do not affect the value of the properties and that the permissible capitalization for the system should equal the total of the separate capitalizations. If any one of the three operating groups of railroads were to be separately reorganized its ownership of valuable securities of one of the other two groups would be a recognizable asset, the value of the securities so owned being proper to add to the value which its other owned property otherwise would possess. Likewise, any income in the form of return on such securities of the other company so owned by the first group would increase the total income of the first group and its total permissible capitalization should be greater than if it did not own those securities. However, the total permissible capitalization of the second operating group of railroads whose securities were so owned would not be less by reason of any ownership of its securities by the first group. If, however, title to the entire owned properties of both groups were vested in a third new company, the securities of either of the *74 former separate groups if transferred to the new company would represent no value to the new company additional to that which it would already possess by reason of the transfer to it of the titles to all of the other properties of the two groups. In the hands of the new company the securities of one of the former groups held by the other would be cancelled. They would add nothing to the earnings of the third new company and would constitute no basis for permitting a higher capitalization of the new company than should be allowed if such securities had not been transferred to it." (Emphasis the Court's.)
Certainly in an ordinary merger inter-company holdings would, under proper accounting procedure, result in cancellations, and this Court can see no material difference arising from the fact that capitalization is the question here. Capitalization is based on value, and where the inter-company holdings represent no value or asset on consolidation, their elimination from capitalization follows as a matter of course. The Court rules, therefore, that in law the Commission was correct on this point.

Comstock Objections.
The most strongly urged objections are those filed by one Andrew W. Comstock, who alleges that he is the holder of $80,000 of 5¼% Secured Serial Gold Bonds of the Missouri Pacific and that he filed these objections on behalf of himself, of 14 owners of at least $90,000 additional of said bonds; and of all other owners and holders of said bonds. His objections are joined in and adopted by the Committee for the 5¼% Secured Bonds.
Comstock objects to the participation of the Alleghany Corporation in the reorganization on the ground that he charges the Alleghany Corporation for its benefit improperly utilized the Debtor Missouri Pacific contrary to the interests of said Debtor. This contention, contained in Comstock's objections 20 to 23, inclusive, cannot be decided at this time because the Court has ordered a separate hearing on the alleged facts and the permissibility of Alleghany's participation. That, however, will not delay a decision on the plan as a whole since the Commission has made provision in the Plan for the eventuality that Comstock might be upheld in excluding or subordinating Alleghany. The Commission said in its Report:
"If, however, the court shall rule that Alleghany Corporation is not entitled to participate in this reorganization, we conclude and find that any new class B common stock and warrants to subscribe to such stock, which, by the allocations of new securities approved herein, would be distributed to Alleghany Corporation, should not be allotted to that corporation, but should be redistributed so as to increase the allotments of class B common stock, and warrants receivable by the other unsecured creditors of the Missouri Pacific group, and by holders of its serial 5¼ per cent bonds, the increase in each case to be in the same proportion as that which the amount of such stock and warrants otherwise receivable by each such other unsecured creditor and each serial bondholder bears to the total amount of such class-B common stock and warrants authorized herein to be issued to all such other Missouri Pacific unsecured creditors and the serial bondholders."
Therefore, no disposition will be made of these objections here.
Comstock alleges and argues that the Interstate Commerce Commission failed to exercise its independent judgment in the promulgation of the present plan, was unduly influenced by the fact that it was initiated and presented as a compromise plan, and was influenced to adopt, without consideration, a deal made by private negotiators, i. e., the proponents of the plan. He, therefore, urges that the Plan must be disapproved because of an alleged failure on the part of the Commission to fulfill its statutory duties independent of agreement. For this allegation the Court finds no basis. Although a compromise plan was presented, it must be noted that plan embodies most of the provisions that the Commission in its 1940 plan had already shown that it considered essential and unopen to alternation. Further, the compromise plan was not accepted by the Commission en toto, but several very material alterations were insisted upon by the Commission. The record sent up to this court from the Commission is loaded with examples of the Commission's painstaking consideration of all of the suggested provisions of the compromise plan, its findings and conclusions on each provision, its alterations of certain of those provisions, and its careful discharge of its statutory duty. This court does not believe that the mere existence and recognition of *75 a compromise plan presented by important parties in interest is any evidence at all of a failure of the Commission to perform its function. In view of the extremely complicated and contentious nature of a railroad reorganization proceeding, and its tendency to drag on over the years, compromise plans are to be favored rather than criticized, when they tend to expedite reorganizations and allow greater participation by those not so securely situated.
Comstock next makes the point that the alternative offer of cash or securities to certain senior creditors is not feasible and will result in a higher capitalization than the Commission has held permissible. Stated as simply as possible, the Commission has held that the new company should be capitalized at not more than $560,000,000. It has further provided in its plan (which was suggested by the compromise plan) that certain senior security holders be given an option to take either securities or cash in lieu of securities (the cash offer representing a considerable reduction of claim). The Commission felt, and correctly so, that allocations of securities to full value of claims made the treatment of senior securities fair and equitable, and that the optional cash offer, which could be electively taken, although representing a reduction in total claims, was valid in light of the alternative provisions. It should be carefully noted that in this alternative cash offer lay the very heart of the compromise in the Plan, as it was the scaling down of senior claims by the alternative cash offers that produced greater participation for junior interests.
In order to carry out these provisions the Plan provides that available cash be used for paying security holders these cash options, or be used to purchase the new company's securities necessary to make the allocations if they elected instead to take securities. The securities to be allocated under the optional offers are all either general mortgage bonds, Series "B," or common stock, Class "A," and as to all or any of the senior security holders given an option and not electing to take cash, these Bonds and Stocks would be provided by purchases from allocations already made to others. No original issuance of these securities to meet contingent allocations is contemplated, and although such issuance is recognized as possible it is not considered probable. The Plan provides specifically the method for putting these provisions into effect:
"Creditors who are entitled to an election to receive securities of one class in lieu of securities of another class or cash in lieu of securities, shall make such election within such time (not earlier than the date upon which the plan is confirmed), and in such manner as the reorganization managers, subject to the approval of the court, shall determine.
"After confirmation of the plan, the trustee of the estates of the debtors shall upon request of the reorganization managers pay to them a sum in cash equal to the difference between (a) the maximum amount which would be payable to creditors under the alternative offers of cash or securities herein provided for and (b) the amount of cash theretofore distributed to such creditors which is to be credited against cash payable under the plan pursuant to Section A hereof. Said funds, together with any cash refunded to the reorganization managers by creditors who shall elect to take the alternative offer of securities, shall be deposited in a separate account to the credit of the reorganization managers and shall be used by them solely for the following purposes:
"(1) On consummation of the plan to pay to creditors who, under the alternative offer of cash or securities, shall have elected to receive cash, the amounts to which such creditors, respectively, are entitled, as set forth in this section T, and
"(2) To acquire in the open market or at private sale, including purchases on a `when issued' basis, a principal amount of general-mortgage bonds, series B, and a number of shares of common stock which shall not exceed the principal amount of general-mortgage bonds, series B, and the number of shares of common stock which are to be issued to creditors pursuant to their election to take such bonds and stock in lieu of cash."
Comstock argues that should these security holders elect to take securities, the capitalization of the new company would exceed $560,000,000, for the reason that that total capitalization can only be maintained where not a single security is issued the option holders or where securities can be purchased at the cash offer price. In other words, he argues that where a security holder elects to take security in lieu of cash, the reorganization managers are bound to purchase him a security in the market at *76 the cash option price or issue additional securities.
After consideration, the Court has come to the conclusion that these arguments are not a valid attack on the Plan for two reasons. First, the Court is of the opinion that the possibility of the reorganization managers being able to buy securities at the option price is not as improbable as Comstock assumes. When he argues that the mere presence of the reorganization managers in the market will drive up the price, he overlooks the fact that the managers will not be pressed for time and can buy when the conditions are favorable. Further, he brushes aside the assurances given by certain representatives of large holders of securities which will be exchangeable under the Plan for general-mortgage bonds, Series B, that these representatives would not, subject to the approval at the time of their directors, permit the development of a corner but would recommend to their respective boards of directors that sufficient of these bonds be placed upon the market within the required price limit to meet any need of the reorganization managers. Although the Court realizes that these assurances are in no way legally binding agreements, still the Court has no fear that these parties will fail to assist the reorganization managers in this regard. He further assumes a far higher market price for the Class "A" stock than seems probable to this Court, in view of the prospective decreased earnings in the post-war period.
Second, the Commission's Report itself shows that the possibility of such an increased issuance of securities was inherent in the Plan and recognized by it, and that provision was made for such an eventuality. The Commission's anticipation of this is found in the provision that the reorganization managers fix the number of shares of each class to be authorized and to be originally issued. Comstock erroneously assumes, however, that if a greater number of shares are issued the capitalization would thereby be increased. His error lies in his failure to recognize that all computations as to this no-par value common stock are based on a purely assigned value of $100 per share and that, therefore, any further issue of such stock would not actually increase the total capitalization one whit. Further, any increased issue of common stock would not affect the compensation of those receiving common stock, as Comstock urges, because the Commission's finding of full compensation was definitely made in the light of their recognition of the possibility that a greater number of shares might be issued. Comstock further overlooks the fact that if the allotted cash cannot buy the required securities on the market, that it can then under supervision of this Court be applied to retirement of other debt, which will obviously work to keep down total capitalization.
The Court is quite favorably impressed with the entire scheme embodied in this alternative cash offer device and rather than disapproving it, as Comstock urges, is inclined toward it most favorably for the beneficial result it has had upon the treatment of junior interests. The Court notes with interest the fact that Comstock's voice among the many interested parties is now alone raised in opposition to this provision.
Comstock next attacks the provisions of the Plan which provide for the methods of designating voting trustees, directors and reorganization managers. He alleges that the method selected by the Commission, whereby the five reorganization managers are designated by representatives of major issues of securities, and a panel of directors is to be designated by similar groups (subject to ultimate selection by the voting trustees), is a delegation of control of the reorganized company to a small group not representative of the security-holders. He urges that the Plan should be altered to provide for the selection of directors and managers by direct vote of the security-holders themselves. The Court is not disposed to sustain this, for the reason that similar provisions for the selection of such officers have met the universal approval of the Commission and U. S. District Courts in other reorganizations. So far as this Court can determine, it has always been customary to authorize designations by responsible representatives of major issues. Further, under this Plan the voting trustees are to be selected by the Court itself and actions of the reorganization managers are to be subject to its approval. The Court believes that following this customary reorganization procedure and delegating authority to representatives who have regularly acted is in all respects warranted, and gives no basis for a fear of dominance by an entrenched group.
The Plan provides that the new first mortgage shall contain a provision *77 which shall permit the new company, with the consent of holders of two-thirds, and in some cases three-fourths, of the new first mortgage bonds, to make various amendments and alterations to said mortgage. It further provides that the new general mortgage shall contain provisions permitting certain amendments to it. Comstock attacks these provisions, referring to them as "escape clauses," on the grounds that they constitute an attempt to circumvent the bankruptcy law by permitting future reorganizations out of court, and that they are contrary to public policy. He points out, apprehensively, the many changes that could be made in the Plan at a later date by the use of these "escape clauses." The Court, however, is not impressed by this objection and is of the opinion that these provisions are sound and wise. They are democratic in nature, allowing for voluntary alterations in the mortgages, as need arises, and provide a far less expensive and formal procedure than court action. Surely a provision that in a fair way prevents full-dress bankruptcy proceedings is desirable, rather than vicious as Comstock urges. There is nothing in the statute which prohibits such a device, and the Court is aware that not only have such clauses been approved in other reorganization proceedings but that they are very common today in non-reorganization indentures.
Finally, there is the so-called Comstock Objection No. 19, which was the subject of a separate hearing and upon which extensive evidence was presented. Objection No. 19 reads:
"19. The Plan is unfair and inequitable by reason of the fact that it `assumed' the validity of an alleged claim of MOP against NOTM for intercompany advances. The allocation of securities to the said 5-¼% Secured Bonds is expressly stated by the Commission to be based on the assumption of the validity of said claim. Any allocation of securities based on the validity of said claim is unfair and inequitable. The National Bankruptcy Act, as amended, requires a full judicial determination on the merits of the validity of said claim. There has been no such determination. The claim is invalid in all respects. It is based on advances purportedly made by MOP to a dominated subsidiary NOTM. Said advances were made in the interests of MOP and not of NOTM. They would not have been made if NOTM had had the benefit of independent management. Detailed objections to the claim of MOP against NOTM are contained in Schedule A annexed hereto and made a part hereof."
Briefly, the Comstock contention amounts to this: that the Missouri Pacific claim against the NOT&M is invalid and, if invalidated, the NOT&M stock, which secures the 5¼% Bonds, would have a value greater than that assigned it by the Commission, which increased value should result in a more favorable treatment of these bonds.
The evidence presented at the hearing of this objection was voluminous and complicated, and cannot be here detailed without unduly prolonging this opinion. The Court has, however, carefully considered the entire record and is of the opinion that, everything considered, the evidence before it does not sustain Comstock's contentions of any impropriety on the part of officers and directors or of the invalidity of the inter-company claim. Railroad finance is, of necessity, of a most intricate nature, and after the passage of twenty years, and the death of most participants, doubt can be cast upon almost any financial transaction. This situation, however, does not amount to a positive showing of impropriety, but rather arises from the extremely intricate nature of the subject matter, which lends itself to strained interpretations when time has blurred the true picture.
Comstock's contentions of the milking of the NOT&M by Missouri Pacific cannot be reconciled with the great benefits conferred upon the Gulf Coast Lines by the Baldwin improvement program. It is not this Court's experience that a parent corporation, when engaged in the type of improper conduct alleged here, pours millions of dollars into the subsidiary to build it up to a position of strength far in excess of that at the date of acquisition. Further, the Court is impressed by the fact that almost all of the transactions of which Comstock complains were entered into only after notice to, and with the approval of, the Interstate Commerce Commission. No substantiation appears for Comstock's innuendo that the Commission was somehow derelict in its duty, or allowed itself to be hoodwinked.
The objector Comstock purchased the securities which give him entree *78 to this proceeding as a speculation in the latter part of 1942 and in the early part of 1943, and he did not become a party until September 30, 1943. No facts have been shown that have not been available to all for many years; and Comstock's being a newcomer does not relieve him from the defense of laches. The bonds that he holds are subject to all of the infirmities which existed at the time he bought them. Looking to the entire record, and the dates upon which the information presented became available, the Court is brought to the conclusion that the contention urged, even were it possible to substantiate it, is stale beyond recall, and that there has been inexcusable delay in its presentation. This Court has confidence in its Trustee, and believes that he has fully performed his duties in relation to this inter-company claim. Time and again opportunity has been presented to various persons to come forward but with no result. Comstock cannot contend he is in the position of a person from whom the facts have been concealed. Rather, he has taken facts apparent to all and only at the twelfth hour has come forward.
Finally, the Court would like to note that the entire attempt by Comstock to disprove the validity of the inter-company claim is not an attack upon those whom he alleges perpetrated a wrong, but, rather, is an attempt to hold other creditors of the railroad responsible for the alleged actions of others. This feature, it appears to the Court, constitutes a basic difference between the alleged situation in this case and the so-called "Deep Rock" case, Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669, so heavily relied upon by Comstock. The other creditors whom Comstock's position would injure are certainly as innocent as he of any alleged malfeasance and those whom he attacks are no longer held to be in interest.
Therefore, the entire record considered, the Court is of the opinion that Objection No. 19 and related objections of Andrew W. Comstock to the Plan of Reorganization, and his objection to the claim of the Missouri Pacific against the NOT&M, should be overruled.
Having considered and disposed of all objections, the Court will next address itself to the criteria about which Section 77, sub. e, of the Act, 11 U.S.C. 205, sub. e, requires that the Judge satisfy himself, regardless of objections. The Court is of the opinion that the requirements of subsections 2 and 3 of said section are adequately provided for in the Plan by Paragraph T thereof, and since hearings on expenses and fees incident to the reorganization have already been held with maximum limits fixed by the Commission no omission is found there. As for the provisions of subparagraph 1, requiring that the Court be satisfied that the Plan "complies with the provisions of subsection (b) of Section 77, is fair and equitable," etc., the very general accord now afforded the Plan is naturally influential in its favor. As a whole, the Court is of the opinion that the Plan meets all of the requirements of the Act. We are, of course, familiar with the prior approved plan, and have carefully studied all recent alterations as well as the actions taken by the Commission in regard to this Court's suggestions in its second opinion. The Court believes that the Commission has fully complied with the requirements of law and given satisfactory further consideration, and that the Plan now presented is in all respects just and satisfactory and holds forth high prospect for a soundly reorganized Missouri Pacific System.
The formulation of a workable reorganization for this huge system has been a long and difficult task, but the Court now believes that, with the approval of the present Plan, the end of the matter is in sight. Although, as the Commission has said, no plan can be drawn which will receive the unanimous approval of everyone, it appears to the Court that the present Plan achieves as near perfection as human fallibility can attain.
Therefore, there will be entered a separate order overruling Objection No. 19 of Andrew W. Comstock, in accordance with the prior order of this Court as to said Objection, and there will be entered an order overruling all other Objections and Claims for equitable treatment and approving that Plan of Reorganization contained in the Third Supplemental Order of the Interstate Commerce Commission. Counsel is directed to submit draft of said orders on notice for approval and signature.
*79 
NOTES
[1] Plus such amount of common stock as may be allotted in satisfaction of general unsecured claims. In addition there will be issued warrants, exercisable for 10 years, for purchase of 494,699 shares of class-B no-par common stock at a price of $100 per share, plus such additional warrants as may be issued to holders of general unsecured claims.
[2] For purposes of comparison, amounts shown are those outstanding as of January 1, 1943, the effective date of the plan as modified, instead of January 1, 1940, the effective date of the plan approved in 1940. The difference is an increase of about $2,000,000.