## COMSTOCK *v.* GROUP OF INSTITUTIONAL INVESTORS ET AL.

NO. 451.

Argued March 9–10, 1948.—Decided June 21, 1948.

212

*Maxwell Brandwen* argued the cause, and *William H. Biggs* filed a brief, for petitioners.

*Charles W. McConaughy* argued the cause for the Group of Institutional Investors et al.; and *Leonard P. Moore* argued the cause for the Manufacturers Trust Co.,

respondents. With them on the brief were *Clair B. Hughes* and *Sanford H. E. Freund.*

*Harry Kirshbaum* argued the cause and filed a brief for the Convertible Bondholders Group, respondents.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Since 1933 the Missouri Pacific, the New Orleans, Texas and Mexico Railway Co. and a number of affiliated railroad corporations have been in reorganization under the Bankruptcy Act, 11 U. S. C. § 205. A second plan of reorganization, approved by the Interstate Commerce Commission, was before the District Court for the Eastern District of Missouri. Comstock then, in 1944, made objection to allowance of a claim of approximately 10 million dollars by the Missouri Pacific, one debtor corporation, against another, the New Orleans, which, during the 10 years of proceedings, had been unchallenged. The issues raised by his objection were severed from other problems of reorganization which do not concern us here. After full hearing the District Court made findings and wrote an opinion, *In re Missouri Pacific R. Co.,* 64 F. Supp. 64, overruling his objections. The Circuit Court of Appeals for the Eighth Circuit affirmed. *Comstock* v. *Group of Institutional Investors,* 163 F. 2d 350.

The issues of fact, contested in a long hearing, are not before us for review. Petitioner assured us, in support of the petition for certiorari here, that "there is no factual controversy before this Court" and "we assume the findings of the District Court. Our challenge is directed only to the legal import of these unchallenged facts."

Much of petitioner's argument seems to depart from these assumptions and to invite us to reach conclusions from the voluminous record in the case, contrary to those reached by the two courts below. This we cannot do.

A seasoned and wise rule of this Court makes concurrent findings of two courts below final here in the absence of very exceptional showing of error. *Stuart* v. *Hayden,* 169 U. S. 1; *Brainard* v. *Buck,* 184 U. S. 99; *First National Bank* v. *Littlefield,* 226 U. S. 110; *Baker* v. *Schofield,* 243 U. S. 114; *Second Russian Insurance Co.* v. *Miller,* 268 U. S. 552; *Texas & N. O. R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548; *Page* v. *Arkansas Natural Gas Corp.,* 286 U. S. 269; *Pick Mfg. Co.* v. *General Motors Corp.,* 299 U. S. 3; *Virginian R. Co.* v. *System Federation,* 300 U. S. 515; *United States* v. *O'Donnell,* 303 U. S. 501; *Anderson* v. *Abbott,* 321 U. S. 349; *Allen* v. *Trust Co.,* 326 U. S. 630; *United States* v. *Dickinson,* 331 U. S. 745. No such error is claimed by petitioner.

Since we are concluded by such concurrent findings, we can do no better than to adopt the statement of facts made in the opinion of the Court of Appeals, on the basis of which petitioner's propositions of law are predicated and must be decided. The essential facts so recited are:

"It appears that the Missouri Pacific acquired the controlling interest in the capital stock of the New Orleans at the end of 1924 and at times relevant here owned from 58 to 93 percent of the total $15,000,000 par value of such stock, and from January 1925, until simultaneous commencement of reorganization proceedings in bankruptcy of both corporations in 1933, it managed the affairs of the New Orleans through Missouri Pacific officers who were given corresponding positions in the New Orleans corporation. An expansion program for both companies was carried on and throughout the course of operations the Missouri Pacific made advancements for improvements and betterments to the New Orleans. Some were repaid, but in February 1933, the

New Orleans filed its application with the Interstate Commerce Commission under Section 20a of the Transportation Act (49 U.S.C.A. Sec. 20a (2)), showing that it was indebted to the Missouri Pacific for an accumulation of such advances over a period of years remaining unpaid in the sum of $10,355,226.78, and that it had been requested by the Missouri Pacific to issue demand notes therefor in the amount of $9,955,226.78 to the Missouri Pacific. It had partially complied by issuing one such note for $400,000.00, and one for $2,498,500, and after hearing the Commission made its finding as required by the statute,[1] 49 U.S.C.A. Sec. 20a (2), and authorized New Orleans to issue to the Missouri Pacific a note for the remaining $7,456,726.78. So that at the time of the bankruptcy of the New Orleans on the same date as that of the Missouri Pacific the notes of the New Orleans to the Missouri Pacific in the sum of $10,355,226.78 were outstanding and unpaid. Under authorization of the Interstate Commerce Commission, granted after hearing, the Missouri Pacific had pledged two of the notes aggregating $9,955,226.78 as security for loans made to it by the Reconstruction Finance Corporation. An additional pledge was made to Railroad Finance Corporation.

"After appointment of the trustees for the railroads

---

"[1] '* * * that the issue by the New Orleans, Texas & Mexico Railway Company of a note or notes in an aggregate amount not exceeding $7,456,726.78, as aforesaid, (2) is for a lawful object within its corporate purposes, and compatible with the public interest, which is necessary and appropriate for and consistent with the proper performance by it of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose.' New Orleans, Texas & Mexico Railway Company Notes, Finance Docket No. 9817; 189 ICC 600, 601, (1933) (R. 20839–20840)."

and on August 29, 1938, an officer of the Missouri Pacific filed claim for that company against the New Orleans for the amount of the notes, plus an item of advancement of $210,000.00, aggregating the amount of $10,565,226.78, describing the consideration as 'cash advances for operation, interest payments, etc., at various times from March 1929 to February 1933, both inclusive.' The items which made up the total $10,565,226.78 were clearly specified and evidence of the validity of the debt as consideration for the notes was adduced before the Commission at an early stage of these Section 77 proceedings, and the obligation was deemed to be valid and ahead of New Orleans' stockholder interest in all of the accountings, computations and adjustments resulting in the plan of reorganization determined by the Commission and approved by the court in 1940. It has also been so considered by the Commission in the plan of reorganization before the court at the time of the hearing and order now appealed from.

"It appears that in 1926 the Missouri Pacific issued and caused to be sold to the public its 5¼% Secured Serial Bonds in the amount of $13,156,000, secured by the pledge of $1000.00 par value of New Orleans capital stock for each $1000.00 principal amount of outstanding bonds, so that the officers who were put in charge of the affairs of both corporations came under fiduciary obligation to the creditors and the stockholders of each company to handle honestly the affairs of each.

"Comstock owns some of said 5¼% Secured Serial Bonds so secured by the pledge of the New Orleans capital stock, and by virtue of his ownership of said bonds he has an interest as a creditor of the Missouri Pacific in the payment of his bonds and the interest

thereon, and also an interest in the capital stock of the New Orleans pledged to secure the bonds. On November 22, 1944, he filed his objections to the plan of reorganization and plea for equitable treatment on the basis of those interests. Certain of his objections contained charges of mismanagement of the Missouri Pacific to his detriment as a bondholding creditor of that corporation, but the separately numbered objections here involved relate to wrongs which he alleges were done by the Missouri Pacific to the New Orleans to the detriment of his interest in the pledged stock of that company.

"By his objections 'Numbered 19 and related objections,' Comstock charged that during the period when the affairs of the New Orleans were controlled by its majority stockholder the Missouri Pacific, between the end of 1924 and the bankruptcy in 1933, the Missouri Pacific management caused the New Orleans to pay dividends illegally out of capital and to improvidently declare and pay dividends unjustified by the business and condition of the New Orleans; improperly loaned money to it for the purpose of enabling it to pay dividends; involved it (the New Orleans) in expansion and improperly made advancements to it and caused it to assume indebtedness growing out of expansion; caused it to be operated with unfair advantage to the Missouri Pacific and loss to itself, and generally mismanaged it and committed spoliation and waste of its property and interests to the financial detriment of the New Orleans and for the benefit of the Missouri Pacific. There is also a charge that the trustee for the New Orleans, who is also trustee for the Missouri Pacific, failed to perform his duties as trustee for the New Orleans, to the detriment of New Orleans stock

interest. Although an Exhibit 'A' attached to the objections assumed to set forth details, the charges remained sweeping and general in form with few exceptions.[2]

"The objector prayed that the Missouri Pacific claim for $10,565,227 and interest against the New Orleans be disallowed; that it be determined that the New Orleans was not indebted to the Missouri Pacific, and in the alternative, that all claims of the Missouri Pacific against the New Orleans be subordinated in the reorganization to the New Orleans capital stock interest.

"The allegations of breaches of obligations on the part of the Missouri Pacific were traversed in pleadings of other parties in interest. The main burden of producing witnesses and evidence to justify the handling of the affairs of the New Orleans by the Missouri Pacific during the period of Missouri Pacific management and to prove the $10,565,226.78 indebtedness of the New Orleans to the Missouri Pacific was carried at the trial by the Group of Institutional Investors Holding First and Refunding Mortgage Bonds of Missouri Pacific Railroad Company and The Protective Committee for the holders of General Mortgage Bonds of Missouri Pacific Railroad Company. They recognized fully the fiduciary nature of the obligation which law and equity attributed to the Missouri Pacific by reason of its pledge of the capital stock of the New Orleans to secure the $5\frac{1}{4}\%$ Serial Bonds while the New Orleans was under its management as majority stockholder, and that by the terms

---

"[2] The Exhibit 'A' also included excerpts from a report of a subcommittee of the United States Senate on the subject of Missouri Pacific System—Inter Company Dividends and Advances, published about July 29, 1940, which criticized Missouri Pacific management of the New Orleans."

of the pledge the Missouri Pacific was entitled to receive itself only the dividends (lawfully and properly declared) of the New Orleans stock and was required as to the corpus of said stock to honestly manage the corporate affairs and to exercise honest judgment and good faith to preserve the stock interest inviolate.

"Comstock did not question or deny that the New Orleans had executed its negotiable promissory notes to the Missouri Pacific which were outstanding at the time of the trial drawing interest, and conceded that the Reconstruction Finance Corporation as an innocent holder thereof in pledge could hold the New Orleans for their face amount and interest, but his contention was that by reason of its wrong-doings the Missouri Pacific either had no valid claim or that such claim as it had should be subordinated to the capital stock interest. He did not assert or tender evidence to show that any specified individuals working for the New Orleans or the Missouri Pacific, or both companies, had misappropriated or wrongfully diverted to their own use any of the assets or business of the New Orleans to the detriment of stockholders. He tendered no evidence to show that the plan of Missouri Pacific system expansion, including expansion and improvement of the New Orleans, and for the financing thereof, adopted and carried through by the Missouri Pacific, was in itself fraudulent or reckless and improvident. As to the New Orleans, the plan contemplated that the Missouri Pacific would advance money to the New Orleans for betterments and additions on short time loans, and that at intervals when the indebtedness became of sufficient size bond issues would be sold to refund it. The worst of the depression came coincidentally with the time when such refunding was expected to be made and made the refunding impossible.

"From testimony frankly given by himself, and on the face of the record, it clearly appears as to the case Comstock presented to the court on the objections herein involved that after the report of the Senate subcommittee which criticized the Missouri Pacific management of the New Orleans, and in 1940, Comstock bought a few of the 5¼% Serial bonds at about 10 cents on the dollar and then employed an accountant to make studies of the accounts, records and reports of Missouri Pacific management of the New Orleans and based his charges on the accountant's studies. He tendered no extraneous or newly discovered evidence. As the period of Missouri Pacific alleged mismanagement of the New Orleans (1925 to 1933) had expired many years before Comstock acquired his interest in New Orleans stock, a court would not ordinarily have felt obliged at his instance to try the merits of charges of mismanagement committed in long past years and claimed to be provable by contemporaneous records which were at all times accessible. It would not sanction such buying into a lawsuit.

"But here the plan for Missouri Pacific reorganization was before the court to be approved or disapproved, according to whether it was or was not fair and equitable. The proposed plan included as one of its essential postulates that the New Orleans was indebted to the Missouri Pacific in a sum which with accumulated interest amounted to around eighteen million dollars. No judicial determination upon the validity of the debt had ever been made in any adversary proceedings throughout the thirteen year course of the Section 77 proceedings and bonds like Comstock's are outstanding in many hands aggregating some $13,500,000. Although the court was of opinion that not only Comstock but all other owners

of the Missouri Pacific 5¼% Serial Bonds secured by New Orleans stock who had at all times trustee representation and in great part representation by counsel, had been guilty of laches in failing for so many years to assert and present proof and try out before the Commission and the court the alleged invalidity of the debt almost entirely evidenced by the notes,[3] it concluded that judicial adjudication should be made as to the debt and that the court should, and therefore it did, hear the evidence covering the whole period of management of the New Orleans by the Missouri Pacific, and it tried out the whole case and all the charges presented by Comstock on the merits.

"The expert accountant called by Comstock produced a large number of exhibits which he had prepared from the books, records and reports of the individual companies and explained in connection with them the inferences he had drawn from his studies and expressed his opinions tending to support the Comstock charges. He centered his attack largely on that part of the accounting system of the railroads through which the New Orleans and its fourteen subsidiary railroads had been treated as a unit for financing purposes and the financial condition indicated by consolidated balance sheets. By disregarding the system character of all the Gulf Coast Lines held under New Orleans ownership he inferred a much less favorable financial position for the New Orleans than was shown by its consolidated balance sheets. He had no personal knowledge of the railroad operations or transactions covered by his testimony.

---

"[3] There was also at all times a substantial minority stockholding interest in the New Orleans with means to keep informed of the affairs of the regulated railroad corporation."

"The Group of Institutional Investors Holding First and Refunding Mortgage Bonds of Missouri Pacific and The Protective Committee for the holders of General Mortgage bonds of Missouri Pacific to sustain the burden of Missouri Pacific defense called as their witnesses on the trial the railroad men who had engaged, each in his own department, in all of the transactions and railroad operations and the records made thereof throughout the period involved, and they. testified of and concerning matters with which they were intimately familiar. Also Mr. William Wyer, who after his graduation from Yale and Massachusetts Institute of Technology served in railroad construction and operation for the government during World War I, and in U. S. Railroad Administration during Federal Control, and afterwards in various positions in the Division of Operations, Division of Accounts and Assistant to the Comptroller. From 1920 to 1927 he occupied important positions with the Southern Railroad Company and the Denver Rio Grande and Western, the latter being 'fifty percent. owned by the Missouri Pacific so it was considered a part of the Missouri Pacific System.' In February, 1929, he became Assistant to the Chairman of the Board of Directors of the Missouri Pacific who was also Chairman of the Board of the New Orleans, and later in the year he became Secretary and Treasurer of the Missouri Pacific and an officer on all the subsidiaries, except as to the Texas and Pacific he was such officers for only six years. He handled a great many of the financial matters involving the Missouri Pacific and the New Orleans under the supervision of the Chairman of the Board of the Missouri Pacific. In 1933 he started studies which have provided substantially all of the studies upon which the various plans of reorganization have been based. He was at the

time of testifying the chief executive officer of the Central Railroad of New Jersey. He was thoroughly informed and conversant with the Missouri Pacific policies of system operation and of expanding and financing, and with the railroad operations and the financial transactions upon which the validity or invalidity of the debt in controversy depend, as well as the accounting and reporting system maintained for disclosing and reporting them. He had an important part in what was done, was in touch with substantially the whole course of the management of the New Orleans under attack and he gave his extensive testimony upon direct and cross examination with obvious understanding of its relevancy and importance. His testimony, supported by many accounting and summarizing exhibits, was to the effect that Missouri Pacific management of New Orleans was honest and was beneficial to New Orleans.

"Judge Moore, presiding at the trial, has exercised the jurisdiction in these Section 77 proceedings through most of their course, and his questions, comments and directions reflect his close attention to and understanding of the testimony and its application through the trial. His written opinion is reported 64 F. Supp. 64. His findings of facts and conclusions of law were drawn with care and thoroughness, and appear to us to be responsive to all the issues presented by the objections here involved and the evidence that was adduced, and the appellant has not called our attention to any refusal on the part of the court to make findings in respect to any other issues claimed to have been presented. The vast extent of the railroad business carried on by the Missouri Pacific and the New Orleans during the long past period of alleged mismanagement and the intricate corporate structures of the railroads, inevitably presented most

serious problems in the attempts of accountants to picture what their course of operations and financial transactions had been. The New Orleans had in some respects the character of a holding company in that it operated itself only a small fraction (around 11%) of the railroad mileage of its railroad system but owned the stocks and securities of some fourteen other railroad companies and was the only one of the group of railroads comprising its railroad system which had any relatively substantial amount of securities outstanding in the hands of the public. For financing purposes the individual roads in the group were dependent upon the New Orleans which, acting for the group in respect to financing, presented the necessary unitary functioning principal. There was fundamental controversy as to what inferences should be drawn from the available accounts to establish the true financial condition of the New Orleans at different times within the period and to establish and present the financial results of the railroad operations that were carried on. Mr. Wyer testified that the identified consolidated balance sheets compiled under direction of the Missouri Pacific and New Orleans officers were the summarizing records which were submitted to the Board of Directors to keep its members informed in the discharge of their duties. It was through the use of the consolidated balance sheets that the New Orleans and its affiliated railroads were treated as a unit in the financing of the companies throughout Missouri Pacific management. Though he could not say what went on in the minds of others, his testimony leaves no room to doubt that the Board members well understood how the computations were arrived at and that the members relied on them in the usual course of the financing of the business. He was intimately familiar with all phases of the ac-

counting in which they culminate, and although he admitted that perfection was never attained, his testimony together with that of the railroad officers and employees who did the work, fully justified the trial court's reliance upon the consolidated balance sheets in his findings and conclusions. But the disputes and conflicts of testimony in respect to the accounts and the inferences to be drawn were all issues of fact. The court recognized fully all the burden of obligation imposed by law upon the Missouri Pacific in respect to its management of the New Orleans and that if the Comstock charges could be proved and the indebtedness in issue was invalid or ought not in equity to be enforced against New Orleans stockholders, the then pending plan of reorganization could not stand.

"Comstock's contention that the court erroneously put the burden of proving his charges on him rather than requiring the Missouri Pacific to proceed first to disprove them, is without merit. As the execution of the promissory notes was admitted and at least formal proof of all of the items of advancements making up the debt had been in the record of the Section 77 proceedings for many years before the hearing, the court required only that all the records of the transactions that were questioned be made available for the hearing so that there was the equivalent of a full disclosure by the Missouri Pacific before Comstock was required to proceed with his proof of the charges. In its findings the court stated the facts as it found them to be proven by the whole evidence. It found in detail and in effect that the Missouri Pacific had administered the affairs of the New Orleans in good faith to the advantage of that company; had made the advancements to it for proper purposes; had not caused dividends to be paid out of capital or im-

226

providently in bad faith, and that the asserted indebtedness arose from advancement made by Missouri Pacific to New Orleans for betterments and additions and was valid and should be allowed in items specified, and that the plan of reorganization based as it was in part on recognition of the existence of the debt in question, was fair and equitable and conformable to the requirements of law regarding the participation of the various classes of creditors and stockholders."

We are confronted at the outset with petitioner's delay and conduct and its effect on the duty of this Court and that below to pass on the merits of his objections. Comstock, apparently with general knowledge of the conduct he alleges to be a wrong toward the securities which he now holds, bought them at about 10 cents on the dollar nearly seven years after the alleged misconduct had ended. Thus, it was not Comstock who was a victim of any wrongdoing but those in whose hands the securities depreciated to the low point at which Comstock bought. It is apparent that Comstock bought a grievance to exploit and to reap the advantage of its rectification. Those who realized the loss through sales to Comstock could, in no event, be indemnified in this proceeding. From every viewpoint, the delay in asserting these claims is unusual. The District Court found it also prejudicial due to the death of six named witnesses and participants, among others, whose testimony would be important. While it considered the objections barred by laches, it nonetheless adjudged their merits.

We think that, in the reorganization proceeding, the courts may entertain on their merits objections to a plan even if made by one who might be barred from asserting a cause of action in his own behalf, if the subject-matter of the objections is such that it goes beyond the objector's individual interests and affects the fairness and equity

of the plan. In view of the amount and position of the claim involved, we do not disagree with the Court of Appeals that such was the case here.

It also is true, as the court below indicates, that this objector made no effort to exhaust or to avail himself of administrative remedies in support of his objection. Neither the objection nor the evidentiary support for it were laid before the Interstate Commerce Commission in its hearings on successive plans of reorganization. The requirement that the Commission "hold public hearings, at which opportunity shall be given to any interested party to be heard, and following which the Commission shall render a report" to the court is not provided without a purpose and is not to be ignored by persons with claims or objections to be heard. This issue involved matters with which the Commission and its staff are especially qualified to deal. It has had no opportunity to express a view on this issue, which was allowed to go by default before it, and the courts do not have the benefit of the Commission's informed judgment on the matter involved. To by-pass the Commission and make the court the original forum for such contentions is not to be encouraged.

But the court did not refuse to hear the objections on their merits. In view of the functions cast upon the court in such cases, we cannot say that it may not, in its discretion, consider objections on their merits even though they have not been presented to the Commission. Some circumstances might be disclosed to indicate a remand for their consideration by the Commission. They might indicate that the courts would withhold approval, not out of deference to the objecting parties' rights but because of the broad responsibility laid upon the court for the equity and fairness of the plan as a whole. The court will be diligent to protect itself and the public from approval of unfair plans, even by default, and may take for its own use evidence no party would have a right

to force upon it.  The court below evidently considered the circumstances of this case to warrant such inquiry into the merits, and we do not inquire whether the discretion was wisely exercised.

The case on the merits presents, as to several different and complicated transactions, a single question of law. It is said that our decision in *Taylor* v. *Standard Gas & Electric Co.,* 306 U. S. 307, requires that the claim of Missouri Pacific against the New Orleans be disallowed and petitioner's objections sustained.  In that case this Court reformulated for application to reorganization cases a wholesome equity doctrine to the effect that a claim against a debtor subsidiary be disallowed or at least subordinated when the claimant corporation has wholly dominated and controlled the subsidiary and in the transactions creating the debt has breached its fiduciary duty and acted both to its own benefit and to the detriment of the debtor.  As we later said of the decision, "This was based on the equities of the case—the history of spoliation, mismanagement, and faithless stewardship of the affairs of the subsidiary by Standard to the detriment of the public investors." *Pepper* v. *Litton,* 308 U. S. 295, 308.

Petitioner asks us to declare the same result in this case despite explicit and unchallenged findings that, in its dealings with New Orleans during the period involved, "the Missouri Pacific acted in good faith and with due regard to its obligations, legal and equitable, to the New Orleans and its security holders," that the "effect of the control by the Missouri Pacific of the Gulf Coast Lines was beneficial and advantageous to the New Orleans and the holders and pledgees of its securities," that all dividends in question "were paid either out of the earned surplus of the New Orleans available for dividends or out of the net income of the New Orleans after payment of·all prior charges against income," and that the sub-

ordination of the claim as asked "would unjustly enrich the holders of the Capital Stock of the New Orleans and the holders of the Secured Serial Bonds," as well as other more detailed findings to the same effect.

In the case before us there was domination of the subsidiary, a relationship between corporations which the law has not seen fit to proscribe. By the application of long-standing principles of equity this Court fashioned the rule in the *Taylor* case to prevent a fiduciary in such a position from enriching itself by breach of its trust. It is not mere existence of an opportunity to do wrong that brings the rule into play; it is the unconscionable use of the opportunity afforded by the domination to advantage itself at the injury of the subsidiary that deprives the wrongdoer of the fruits of his wrong. On the findings in this case, the claim of Missouri Pacific was the outgrowth of complicated but legitimate good faith business transactions, neither in design or effect producing injury to the petitioner or the interests for which he speaks.

Special emphasis has been placed on the fact that under control of the Missouri Pacific dividends were paid by the subsidiary at a time when it was borrowing money represented by this claim. It is clear from the findings that the dividends were paid out of current earnings or surplus, and not in violation of law or contract. Only in 1929 did New Orleans earn currently sufficient to pay its dividends. Nevertheless in all three years there was sufficient earned surplus legally to permit dividends. Heavy investments in improvements may require borrowings for dividends; but no law or public policy requires a corporation to finance capital additions out of earnings or to pass dividends because of low current earnings when past earnings are available for dividend purposes. These past earnings may be used to compensate the capital that produced them, and capital additions may be made from funds borrowed or raised by issues of capital securities,

so long as the authórizations required in the case of railroads are obtained. No question is raised as to the authority to borrow.

While the contemporaneous borrowing to pay for capital additions, and payment of dividends, is not in itself illegal, it would, of course, come under the ban of the *Taylor* decision if it were carried out in breach of good faith for the advantage of the holding company to the detriment of the subsidiary. But the findings of good faith, fair dealing and freedom from fraud or overreaching cover the dividend policy as well as other questioned transactions. Such being the facts, the allowance of the claim is not error of law.

The findings here do not stop with holding that the questioned transactions were intended to and did benefit the system as a whole. An over-all benefit to the system might be attained at the injury of one of its units and the security holders of that unit. But here the finding of good faith and of benefit applies to the New Orleans and its security holders as well as to the system generally. The finding is unequivocal that the control of Missouri Pacific not only was "in good faith and with due regard to its obligations, legal and equitable, to the New Orleans and its security holders," but also that its control of the Gulf Coast Lines "was beneficial and advantageous to the New Orleans and the holders and pledgees of its securities." The criticised transactions are thus not only exonerated of evil or illegal intent but are also established as beneficial rather than injurious to the interests which now challenge them. The findings to that effect are entitled to special weight where, as here, they are based on the District Judge's complete familiarity with the case. *Reconstruction Finance Corporation* v. *Denver & Rio Grande Western R. Co.*, 328 U. S. 495, 533. Affirmed by the Circuit Court of Appeals, they are, under the rule concerning concurrent findings, and on the basis of our grant of certiorari, conclusive in this Court.

Disallowance of petitioner's objections on such findings was not error of law. In this view of the case we need not consider questions tendered as to validity or effect of the issuance of notes or of their pledge.

The judgment below in No. 451 is

*Affirmed.*

Petitions in Nos. 452, 453 and 454 were addressed to dismissals by the Court of Appeals from the same order as No. 451 but taken in different names. The petitions were filed as safeguards against procedural objections to review of the order. The writs in these cases are dismissed.

MR. JUSTICE MURPHY, with whom MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE RUTLEDGE agree, dissenting.

The rule that makes concurrent findings of fact by two courts below binding on us in the absence of some very exceptional error is a wise one. But it is not a rule to be applied in a blind manner simply because a case involves a complex factual situation. In my view, there is an exceptional error involved in the conclusions reached by the District Court and affirmed by the Circuit Court of Appeals, an error that is apparent on the face of the District Court's findings. And since this error is not sufficiently illuminated by the opinion of the Circuit Court of Appeals, 163 F. 2d 350, as quoted by the majority in this Court, I deem it essential to make an independent statement of the relevant facts as found by the District Court.

This case grows out of the joint reorganization of the Missouri Pacific Railroad Company and affiliated railroad corporations under § 77 of the Bankruptcy Act, 11 U. S. C. § 205. It involves a claim of $10,565,226.78 filed by the Missouri Pacific against one of its subsidiaries which was also undergoing reorganization and the application to that claim of the so-called Deep Rock doctrine enunciated in *Taylor* v. *Standard Gas Co.*, 306 U. S. 307.

It is unnecessary for present purposes to detail the long, complicated and still unfinished proceedings which have marked the reorganization of the Missouri Pacific railway system. The instant proceeding is directly related to a revised plan of reorganization approved in 1944 by the Interstate Commerce Commission. The District Court below then heard objections to the plan by various parties in interest. Included among them was the petitioner Comstock. He stated that he owned $80,000 principal amount of the 5¼% Secured Serial Gold Bonds of the Missouri Pacific. His objections were filed on behalf of himself, of fourteen other public investors holding in excess of $900,000 additional principal amount of these bonds, and of all other owners and holders of the bonds. A committee of these bondholders, representing an additional $315,000 principal amount of the bonds, also joined in Comstock's objections. Of the total principal amount of these bonds publicly outstanding, about 11½% were specifically represented by Comstock.

Comstock's objection No. 19, which is our sole concern, related to the validity and priority of a $10,565,226.78 claim filed by the Missouri Pacific (hereinafter called MOP) against its subsidiary New Orleans, Texas and Mexico Railway Co. (hereinafter called NOTM) in the joint reorganization proceedings. It appears that MOP had acquired the controlling interest in NOTM's common stock in 1924 and had completely dominated and controlled NOTM until the reorganization proceedings began in 1933. MOP's claim against NOTM was based upon "cash advances for operation, interest payments, etc. at various times from March, 1929 to February, 1933, both inclusive." Most of the NOTM stock which MOP held was pledged as security for the class of MOP 5¼% secured bonds which Comstock owned, the pledge constituting 82% of the outstanding shares of NOTM's sole class of stock. MOP sought to put its claim against

NOTM ahead of the claims of the holders of these MOP bonds who looked to the NOTM common stock for security. The revised plan of reorganization gave effect to MOP's desire in this respect.

A separate hearing was held by the District Court on Comstock's objection No. 19. After carefully considering the voluminous and complicated evidence adduced at this hearing, the court entered a separate order overruling the objection and holding that the $10,565,226.78 claim should be allowed in full; with interest, this claim now aggregates more than $18,000,000. The court further held that this claim, so allowed, was entitled to priority over the claims of the public investors holding MOP $5\frac{1}{4}\%$ secured bonds. In addition, the court felt that objection No. 19 was not timely and should be barred from consideration under the doctrine of laches.

At the same time, the District Court entered another order overruling the other objections raised by Comstock and the other parties in interest and approving the revised plan of reorganization. An opinion was then filed detailing the reasons for the two orders. *In re Missouri Pacific R. Co.,* 64 F. Supp. 64. Comstock appealed from the order dismissing his objection No. 19.[1] The Eighth Circuit Court of Appeals affirmed the District Court's

---

[1] The leading party opposing Comstock on this appeal was the Group of Institutional Investors, holding first and refunding mortgage bonds of MOP. This group represented less than 10% of such bonds and admitted that it had "no financial interest in the controversy revolving about" the MOP claim, its only interest being to expedite a reorganization plan then under consideration. But this group offered the only evidence in the District Court in support of the MOP claim. Another party was the NOTM mortgage and income bondholders committee, which also admitted it had no direct interest in the MOP claim litigation. Other parties included MOP, the MOP common and preferred stockholders committees, the MOP trustee, Alleghany Corporation, and certain groups of creditors and indenture trustees. These parties are now respondents before us.

action on this objection, holding that the findings of that court were not clearly erroneous. *Comstock* v. *Group of Institutional Investors,* 163 F. 2d 350. At the suggestion of the Interstate Commerce Commission, the Circuit Court of Appeals then remanded the revised plan of reorganization back to the Commission for reconsideration and revision. *Wright* v. *Group of Institutional Investors,* 163 F. 2d 1022. The Commission has not yet disposed of the matter.

## I.

For somewhat different reasons than those advanced by the Court, I agree that a judicial consideration of Comstock's objection No. 19 is not now precluded by the doctrine of laches.

The joint reorganization proceedings commenced in 1933. Comstock did not purchase any of the MOP $5\frac{1}{4}\%$ secured bonds until 1940, soon after a Senate subcommittee investigating railroads issued a report criticizing the MOP management of NOTM. S. Rep. No. 25, Part 9, 76th Cong., 3d Sess. He then bought some of the bonds at about 10 cents on the dollar and employed an accountant to study the relationships between MOP and NOTM prior to 1933. Not until 1943 did Comstock suggest that there might have been some irregularities on the part of MOP. And not until November, 1944, when he filed his objection No. 19 to the revised plan of reorganization, did he really press his allegations.

Prior to Comstock's objection, more than a decade of the reorganization process had produced no charge or revelation of impropriety as to MOP's $10,565,226.78 claim against NOTM. Numerous investigations and hearings had been held during that long period concerning the pre-reorganization administration of the affairs of MOP and its subsidiaries. The public holders of the MOP $5\frac{1}{4}\%$ secured bonds and other creditors had ample

opportunity to question the allowance of the claim. But no charges were made until after Comstock purchased his bonds and conducted his own investigation. Many of the events to which objection No. 19 relates took place more than twenty years ago; and some of the persons who had personal knowledge of those events and who might have been able to testify in regard thereto are now dead.

I do not believe, however, that the doctrine of laches is properly applicable to the facts of this case. The District Court had before it a revised plan of reorganization of MOP and its subsidiaries, a plan which recognized that NOTM was indebted to MOP and which permitted MOP to collect that debt without subordination to other creditors. That court was duty bound to test this portion of the plan by the fair and equitable rule and to approve it only if the rule was found to be satisfied. *American Ins. Co.* v. *Avon Park,* 311 U. S. 138, 145–146. The court's duty was nonetheless existent because an attack on the MOP claim came late in the day. Comstock's objection served only to emphasize the circumstances surrounding this indebtedness and to give the court an opportunity to inquire into the matter more fully than it might otherwise have done. Moreover, the fact that this objection had not previously been raised and adjudicated in the § 77 proceedings added to the appropriateness of a judicial determination of the validity of the debt at this juncture. Only by examining the matter now could the court be certain whether the treatment accorded the debt by the reorganization plan was fair and equitable.

The motives which led Comstock to acquire his bond holdings and to raise his objection No. 19 are not pertinent to the performance of the District Court's duty of testing the fairness of the reorganization plan. Nor is it decisive under these circumstances that the objection might have been raised earlier by Comstock or some other

bondholder. It is enough that the matter was presented in an appropriate fashion at a time when the court was compelled to pass judgment upon the reorganization plan and at a time when no prejudicial change in the position of other parties had yet occurred.

In this connection, it is noteworthy that the Interstate Commerce Commission at an early stage in the § 77 proceedings held that the validity of the MOP claim is a matter "for litigation in the Courts." Thus Comstock would likely have been unsuccessful had he attempted to secure a determination of his objection by the Commission before going to court. The Court today, however, expressly holds that the Deep Rock issues raised by Comstock involve matters over which the Commission has jurisdiction and with which it is especially qualified to deal. See *Schwabacher* v. *United States*, 334 U. S. 182. On this phase of the case, I am in agreement with the Court. The Commission should determine the applicability of the Deep Rock doctrine to railroad reorganization plans which it formulates. But since the Commission had previously refused to adjudicate the merits of the MOP claim and since Comstock's objection has been thoroughly aired in the District Court, it is inappropriate to remand the case now to the Commission for an expression of its views.

Despite the claimed difficulties due to the age of the pertinent events and the death of some of the witnesses, the District Court was able to give a comprehensive treatment to Comstock's objection and to render an informed judgment on the fairness of MOP's claim against NOTM. Many of the issues revolved about written evidence and statistics. And the court was able to draw upon its intimate knowledge of the MOP-NOTM relationships, knowledge gained from long association with the reorganization proceedings. Hence the court could and did perform fully its function as to that portion of

the revised reorganization plan with which objection No. 19 was concerned.

In this situation, the desirability and necessity of determining the fairness and equitableness of MOP's claim far outweigh any possible inconvenience caused by the late presentation of the matter.

## II.

In *Taylor* v. *Standard Gas Co., supra,* this Court established the principle that where a parent corporation has not only dominated but has mismanaged a subsidiary corporation, which is presently in bankruptcy or reorganization, and where the parent has a claim which is intimately related to the mismanagement, a court may refuse to permit the parent to assert the claim as a creditor except in subordination to the claims of the subsidiary's other creditors and preferred stockholders. This principle, which has become known as the Deep Rock doctrine, is equitable in nature. As explained in *Pepper* v. *Litton,* 308 U. S. 295, 308, the doctrine was applied in the *Taylor* case on the basis of "the equities of the case—the history of spoliation, mismanagement, and faithless stewardship of the affairs of the subsidiary by Standard to the detriment of the public investors."

The fulcrum of Comstock's objection No. 19 is the Deep Rock doctrine. The argument is that the items constituting the $10,565,276.78 claim filed by MOP against NOTM are impregnated with MOP's alleged mismanagement of NOTM and that the claim should therefore be subordinated to the claim of the public investors in the MOP 5¼% secured bonds, who are secured by MOP's pledge of the NOTM common stock.

It is no answer to Comstock's claim that the District Court found that the transactions giving rise to the MOP claim were carried out in good faith. The equities which form the Deep Rock doctrine relate not alone to matters

of bad faith. They are also concerned with the essential fairness and propriety of transactions from an objective standpoint. *Pepper* v. *Litton, supra,* 306. Like negligence, inequity may be present where there is the utmost subjective good faith. If there is mismanagement and if there is undue harm to the creditors and preferred stockholders of the subsidiary, the Deep Rock doctrine dictates subordination of the parent's claim. And if there be good faith on the part of the parent's officers, it hardly justifies ignoring the injury to the subsidiary's creditors and stockholders. Equity looks in all directions. Only in that way can the various interests in the corporate community be adequately protected.

Moreover, the issues raised by Comstock are not resolved by the District Court's finding that operational benefits accrued to NOTM and its subsidiaries by virtue of the transactions underlying MOP's claim. These transactions were undoubtedly tied in with the expansion program which MOP was undertaking during this period. But a breach of fiduciary obligations is not to be condoned by the presence of accompanying benefits where the subsidiary's assets are depleted to the injury of the stockholders and creditors of the subsidiary.

Nor does the fact that MOP, the parent, is insolvent bar an application of the Deep Rock doctrine to the facts of this case. The insolvency of the parent and the consequent effect of subordination upon the parent's innocent creditors are certainly factors to be considered. See *Consolidated Rock Co.* v. *Dubois,* 312 U. S. 510, 524; *Prudence Corp.* v. *Geist,* 316 U. S. 89, 97. But they are not necessarily decisive in all cases. The equities of a particular situation may turn upon something more than the solvency or insolvency of the parent. It may well be that a balancing of competing equities reveals that it is unjust to permit the advantages arising from

the parent's breach of fiduciary duties to adhere to the benefit of the innocent creditors of the insolvent parent. Some other innocent parties may have an overriding interest which justifies subordination of the claim. Or the claim itself may be so tainted with inequity and unenforceability as to require subordination regardless of the parent's insolvency. And so the Deep Rock doctrine is as broad and as narrow as the equities in each case.

In this instance, I believe that the public holders of the MOP $5\frac{1}{4}\%$ secured bonds have a sufficiently direct and overriding interest in the financial well-being of NOTM to justify subordinating the MOP claim should it appear that this claim is intimately associated with a breach of MOP's fiduciary duties. MOP secured these bonds with a pledge of the NOTM common stock and expressly undertook not to impeach the pledge. Any wrongful conduct by MOP which diminished the size of NOTM assets would impair the value of the NOTM stock. Subordination of the claim would thus tend to make the NOTM stock more valuable and to make possible a realization of MOP's express pledge to its bondholders. True, creditors of MOP other than the bondholders would be unable to benefit from whatever could be collected on the claim. But they were not the recipients of a pledge of NOTM stock and they lacked the immediate interest that the bondholders had in a proper performance of MOP's fiduciary duties. The indirect loss they would suffer by subordination is outweighed by the direct injury to the bondholders as a result of allowing the claim.

It is therefore essential to study the various transactions in detail to determine whether they represent the type of mismanagement by a parent which leads to subordination of the resulting claim against the subsidiary.

## III.

The District Court found that during the period from March, 1929, to February, 1933, MOP advanced to NOTM the net sum, after deducting principal payments, of $10,565,226.78—which constitutes the claim in issue. Included in these advances was the greater portion of the $2,795,000 loaned to NOTM between November 30, 1928, and November 27, 1931, to make additions and improvements to the railroad properties of NOTM and other related subsidiaries. But each time one of these advances was made, there was an almost simultaneous payment of a dividend by NOTM on its stock, which was largely owned by MOP. This phenomenon is demonstrated in the following table:

| Dates of— | | Advances by MOP to NOTM | Dividends by NOTM | |
|---|---|---|---|---|
| Advances | Dividends | | Total amount | Amount to MOP |
| Nov. 30, 1928 | Dec. 1, 1928 | $300,000 | $259,576 | $233,231 |
| Feb. 28, 1929 | Mar. 1, 1929 | 250,000 | 259,576 | 234,237 |
| Aug. 31, 1929 | Sept. 3, 1929 | 275,000 | 259,576 | 239,429 |
| Nov. 29, 1929 | Dec. 1, 1929 | 310,000 | 259,576 | 241,529 |
| Feb. 28, 1930 | Mar. 1, 1930 | 260,000 | 259,576 | 242,072 |
| May 31, 1930 | June 1, 1930 | 275,000 | 259,576 | 242,212 |
| Nov. 29, 1930 | Dec. 1, 1930 | 300,000 | 259,576 | 243,360 |
| Feb. 25, 1931 | Feb. 28, 1931 | 75,000 | 259,576 | 243,510 |
| May 27, 1931 | June 1, 1931 | 200,000 | 259,576 | 244,387 |
| Aug. 29, 1931 | Aug. 31, 1931 | 250,000 | 259,576 | 244,527 |
| Nov. 27, 1931 | Nov. 30, 1931–Dec. 1, 1931. | 300,000 | 259,576 | 244,527 |
| | | *$2,795,000 | $2,855,336 | $2,653,021 |

*It is contended by the respondents that this figure should be reduced to $2,082,456, since the first two advances in November 1928, and February 1929, were repaid and since the excess of the advances over the dividends should not be counted.

It is said, however, that MOP's action in making these loans and receiving back the dividends followed a natural pattern of a company devoted to improving the properties of its subsidiaries, there being merely a "near coincidence as to the dates of certain dividends and advances."

Reference is made in this respect to the relationship which MOP bears to the various companies in the Gulf Coast Lines system (hereinafter called GCL). In 1924, MOP acquired a controlling interest in NOTM and thereby inherited complete control of the GCL system, the rail lines of which are interlaced with others in the MOP system. NOTM at all times has been primarily a holding company owning all the stocks and bonds of the fourteen subsidiary companies constituting the GCL group, NOTM itself operating only about 11% of the total GCL mileage. Of the GCL operating companies, the St. Louis, Brownsville and Mexico Railway Co. (hereinafter called Brownsville) is the most important, operating about one-third of the GCL mileage and contributing from 61% to 84% of the group's income during the period in question. NOTM is the only one of the GCL group which has securities outstanding in the hands of the public.

According to the District Court findings, MOP's policy in advancing the $2,795,000 to NOTM was to reimburse NOTM's treasury for additions and betterments to the properties of the GCL system. NOTM acted as banker for that system. The GCL subsidiaries were not in a position from 1925 to 1930 to finance their own improvements except out of earnings and by borrowing from NOTM. Most of their freight revenues were cleared through NOTM; as these items were received by NOTM, they were credited against the obligations created by the loans from NOTM to the subsidiaries. But since the total requirements of the subsidiaries for operating expenses, dividends and improvements were in excess of the receipts, the unpaid accounts mounted. Finally MOP had to begin loaning money to NOTM to cover these accounts. It is in this way that MOP's advances are said to have been directed toward the improvement program of the GCL system.

It is vigorously denied that these MOP advances were in any way used to pay for the almost simultaneous dividends from NOTM to MOP, such a contention being termed "superficial" and contrary to "basic principles of accounting." In support of that denial, an illustration is used. Assume that NOTM receives $200,000 cash from net earnings on January 31, when it is known that this amount will be needed to pay a bill for a new freight yard for a subsidiary. NOTM also knows that on April 1 a $100,000 cash dividend to MOP will be due. Instead of borrowing to pay for the new freight yard, NOTM uses the $200,000 cash for that purpose. Then, three days prior to the dividend date, NOTM borrows $100,000 from MOP to reimburse the NOTM treasury in part for the investment in the new freight yard. This saves NOTM about two months' interest on $100,000 of the money spent for the freight yard. The fact that a $100,000 cash dividend is paid three days after the $100,000 loan is thought to be a mere coincidence, the dividend and the loan having no connection.

But in this illustration it is obvious that NOTM has insufficient cash to finance both the $200,000 freight yard and the $100,000 dividend. It has to borrow money for one purpose or the other. But to say that it here borrows $100,000 to help pay for the freight yard is unrealistic. NOTM has enough cash to pay for the freight yard and it uses the cash just for that purpose. Two months later it has the choice of (1) borrowing $100,000 and paying the dividend, or (2) not borrowing the money and not paying the dividend. It chooses the former course of action. By such action, NOTM has borrowed money to pay a dividend.

The foregoing illustration indicates what the record in this case amply demonstrates—namely, that the MOP advances found by the District Court to have been for the payment of GCL improvements were in reality ad-

vances for the payment of dividends by NOTM, dividends which for the most part went to MOP. Considered as a separate entity, NOTM rarely had enough income from the time MOP acquired control in 1924 to the start of reorganization in 1933 to pay the regular dividends; loans were essential if MOP was to continue to receive its share of these dividends.

| Year | Net income | Dividends |
|------|-----------|-----------|
| 1925 | $839,679.00 | $1,038,198 |
| 1926 | 1,393,806.58 | 1,038,198 |
| 1927 | 937,098.90 | 1,038,198 |
| 1928 | 742,058.00 | 1,038,198 |
| 1929 | 1,153,257.54 | 1,038,198 |
| 1930 | 854,139.71 | 1,038,198 |
| 1931 | *399,487.80 | 1,038,198 |
| 1932 | (−951,607.76) | None |

*After deduction of $3,155,000 for that portion of the dividends on Brownsville stock held by NOTM which was unpaid in 1931.

After studying these dividends from NOTM to MOP, the subcommittee of the Senate Committee on Interstate Commerce investigating railroads (composed of Senators Wheeler and Truman) concluded as follows:

"The N. O. T. & M. itself never earned enough to pay these dividends. In none of the 6 years, 1926 through 1931, did the N. O. T. & M. earn more than $605,000 (exclusive of dividends from its subsidiary, the St. Louis, Brownsville & Mexico). In 3 of the 6 years, the road showed a deficit after fixed charges. For the 6-year period considered as a whole its stated net income totaled a bare $90,000 (as against dividend declarations totaling $6,300,000).

"Even the $90,000 net income figure was a considerable overstatement. Each year the N. O. T. & M. regularly included in its operating expenses a certain sum for depreciation of its equipment. Consistently, year after year, the amount charged for depreciation was inadequate. A

statement from the files of the railroad itself shows that for the period 1926 through 1930 the N. O. T. & M.'s net income was overstated (through understatement of depreciation) by more than $411,000. If the railroad's depreciation had been adequately charged, it would have shown a deficit for the 6 years 1926–1931 of $321,000 after fixed charges. Yet during this period the Missouri Pacific took $5,580,000 in dividends out of the N. O. T. & M." S. Rep. No. 25, Part 9, 76th Cong., 3d Sess., pp. 2–3.

The consolidated picture of NOTM and its GCL subsidiaries was equally indicative of the lack of an ability to pay dividends to MOP without borrowing.

| Year | Net income | Dividends |
|---|---|---|
| 1925 | $2,547,633 | $1,038,198 |
| 1926 | 1,783,278 | 1,038,198 |
| 1927 | (−202,438) | 1,038,198 |
| 1928 | 956,433 | 1,038,198 |
| 1929 | 845,064 | 1,038,198 |
| 1930 | 674,950 | 1,038,198 |
| 1931 | (−1,122,422) | 1,038,198 |

Care was taken, however, to avoid the appearance of borrowing from MOP to pay dividends to MOP, a practice of doubtful legality. Whenever it was found that NOTM had inadequate income to meet a prospective dividend payment, MOP officers would direct Brownsville, NOTM's principal subsidiary, to take steps to declare a dividend on its stock, all of which was held by NOTM. Usually this dividend was the precise amount by which NOTM lacked money to pay its own dividend.[2] But Brownsville invariably was unable to

---

[2] The method by which MOP would bring about the Brownsville declaration of dividends is shown by the following typical exchange of letters between NOTM and MOP officials:

"Houston, January 10th, 1931

"Mr. L. W. Baldwin: The net income of the NOT&M for the three months ending November 30th, 1930, reflects a deficit of $56,613.10,

make a cash payment of its dividends to NOTM and many of its pre-1931 dividend declarations were considered collected by NOTM only at the expense of leaving unpaid Brownsville's debts to NOTM for essential supplies. These paper dividend declarations were capped in 1931 when Brownsville was ordered to declare dividends to NOTM of $4,155,000; in that year Brownsville earned but $398,000. The Bureau of Accounts of the Interstate Commerce Commission in 1936 informed NOTM that these 1931 dividends were declared at a time when NOTM was aware that Brownsville "was without funds to pay it, and even on the basis of past experience, the earnings of the company, had business continued good, would not have been adequate to make the payment until some future date." This fact rendered the divi-

---

which is $316,188.85 short of quarterly dividend requirement of the NOT&M due December 1st, 1930.

"I am attaching hereto statement showing result of operations for the months of September, October, and November 1930.

"Following past practice, we will arrange for Mr. Cole to list for action at the next meeting of the Board of Directors of the StLB&M [Brownsville], a resolution providing that dividend be declared out of the surplus of the StLB&M in favor of the NOT&M.

"H. R. SAFFORD.<br>"F."

The reply to the foregoing letter follows:

"St. Louis, Mo., January 13, 1931

"Mr. Safford: Referring to your letter of January 10th, file 482–2, with reference to declaring dividend out of the surplus of the St. Louis, Brownsville & Mexico Railway Company in favor of the New Orleans, Texas & Mexico Railway Company.

"It will be satisfactory to handle this in line with your letter.

"L. W. BALDWIN,<br>"Per C. D. P."

On June 17, 1931, Brownsville declared a dividend of $316,188.85, the precise amount of the NOTM deficit; the dividend was declared effective as of November 30, 1930, one day prior to the dividend date for NOTM's stock.

dends improper under Commission rules. And while it was too late to correct the income accounts of NOTM which had already been closed, NOTM was directed to write off the unpaid portion of the 1931 dividends (some $1,400,000) through profit and loss.

This 1931 incident grew out of the fact that NOTM was operating that year at a great loss. It began that year with a profit-and-loss balance of only $709,000 and operated at a loss of $606,000. It also had to charge off $875,000 to correct its former inadequate depreciation accruals. By the end of 1931, NOTM would have shown a debit profit-and-loss balance of $772,000 or more. MOP, of course, was demanding payment of the usual $1,038,000 dividend for the year. "The problem was solved as it had been solved in previous years—by milking the Brownsville. But this time the milking would have to be thorough. . . . The solution found was to cause the Brownsville to declare an extraordinary dividend of $3,500,000—a dividend seven times the par value of the stock upon which it was declared. Other Brownsville dividends to the N. O. T. & M. brought the total for the year to $4,155,000, enough to fill up the N. O. T. M.'s profit-and-loss deficit and to enable the latter to declare a $1,038,000 dividend in favor chiefly of the Missouri Pacific." S. Rep. No. 25, Part 9, 76th Cong., 3d Sess., p. 10.

Thus the Brownsville dividend declarations gave NOTM earned surpluses on paper without giving it any cash with which to pay its dividends to MOP. Dividends declared by Brownsville were entered as income to NOTM even though they were not paid. An ostensible legal basis was thereby established for a declaration of dividends to MOP. NOTM would then borrow money from MOP to pay for those dividends. This again was largely a paper transaction. The earned surplus upon which the Court today places great reliance in affirming the District Court's findings was but a figment of the

MOP imagination. "The intricate accounting devices evolved by railroad and holding company officials in an attempt to legalize dividend payments unjustified by earnings resulted, both in 1930 and in 1931, in the payment of N. O. T. & M. dividends out of capital, a procedure disguised in 1930 behind faulty bookkeeping and in 1931 behind an out-and-out violation of Interstate Commerce Commission accounting regulations." S. Rep. No. 25, Part 9, 76th Cong., 3d Sess., p. 14.

By advancing to NOTM $2,795,000, MOP received back $2,654,000 in dividends within a few days after the various loans, making a total net advance of $141,000. MOP's cash position was unaffected by these various transactions, the NOTM dividends merely giving it a paper profit-and-loss balance out of which to declare its own dividends. Hence MOP, like NOTM, was forced to borrow money; it did so from outside sources. Yet MOP now seeks to claim nearly all of the $2,795,000 plus interest, an aggregate of about $4,795,000, for engaging in these bookkeeping transactions and for extending credit to the extent of $141,000.

NOTM's fiscal affairs in this respect have certainly not "been conducted with an eye single to its own interests" within the meaning of the Deep Rock doctrine. *Taylor* v. *Standard Gas Co., supra,* 323. Nor can these transactions be said to meet the test of "inherent fairness" and the requirement of an "arm's length bargain," which are essential ingredients of that doctrine. *Pepper* v. *Litton, supra,* 306–307. Here, as in the *Taylor* case, dividends were declared in the face of the fact that NOTM had not the cash available to pay them and was, at the time, borrowing in large amounts from MOP. And see *In re Commonwealth Light & Power Co.,* 141 F. 2d 734, 738. Compelling a subsidiary to pay dividends under these circumstances is the type of mismanagement by a parent which leads to the subordination of the resulting indebtedness.

## IV.

Another part of the $10,565,226.78 MOP claim related to an intercompany adjustment of $1,261,009.84 made during October, 1932, at the height of the depression and shortly before the § 77 proceedings began.

The International-Great Northern Railroad Co. (hereinafter called the I-GN) was a subsidiary of NOTM, although not deemed a part of the GCL system. I-GN had advanced cash or delivered materials to ten of NOTM's GCL subsidiaries; as of October 31, 1932, these ten companies were indebted to I-GN in the sum of $1,261,009.84 on account of these transactions. On the same date, I-GN was indebted to MOP in an amount in excess of $1,261,009.84.

It was known at this time that the I-GN claims against the NOTM subsidiaries were presently uncollectible. It was also apparent that NOTM was in better financial health than I-GN. MOP, which was then in need of loans from outside sources, sought to improve its own financial condition by shifting debtors. It did this by increasing its claim against NOTM by $1,261,009.84 and by decreasing its claim against I-GN by that same figure. To make this bookkeeping shuffle possible, I-GN credited NOTM and its other subsidiaries with the payment of the $1,261,009.84 debt which those subsidiaries owed. MOP then credited I-GN with payment of a like amount, crediting it against I-GN's debt to MOP. NOTM thereby found itself obligated to pay MOP an additional $1,261,009.84. Appropriate entries were made, of course, in the journals of the affected companies.

NOTM had not previously been liable to pay this amount to MOP; nor did it receive anything of value from MOP in return for assuming the debt. Yet no valid reason is suggested why NOTM should have been forced to shoulder this obligation, thereby decreasing the assets available to its creditors and stockholders. Cer-

tainly it was not essential, as has been claimed, that NOTM acquire the debt to protect its ownership and control of its GCL subsidiaries.  NOTM was invulnerable in that respect, owning all the securities of the subsidiaries, and the addition of this debt added no new protection.  The contention is also made that NOTM owed a fiduciary obligation to I-GN, its subsidiary, and that it was NOTM's duty to relieve I-GN of any uncollectible items owed by other NOTM subsidiaries.  The fiduciary obligation grows out of the fact that NOTM owned all the securities of its GCL subsidiaries.  This contention is closely allied to the theory that NOTM and the subsidiaries are a single financial entity and that it is immaterial which company within that entity is liable for the debt.  But the close relationship of NOTM and its GCL subsidiaries does not legitimatize the intercompany adjustment from an equitable point of view.  In this situation, we are dealing with the rights of creditors and stockholders who are directly interested in the financial well-being of NOTM as an enterprise separate and distinct from its subsidiaries.  Hence it is necessary here to recognize and give effect to the corporate distinctions between NOTM and its GCL subsidiaries.

The resulting picture is one of a bookkeeping write-up of NOTM indebtedness at a time when NOTM was on the threshold of reorganization.  NOTM received nothing whatever to compensate for the increase in its debt structure.  The increase served only to enable MOP, the parent, to possess what was thought to be a more favorable creditor's position.  Such treatment of a subsidiary's debt structure does not square with a parent's fiduciary position.  A subsidiary is entitled to be saddled by a parent only with those debts which may fairly be allocated to it, debts which grow out of legitimate business transactions.  To transfer debts promiscuously from one subsidiary to another merely to augment the parent's

creditor status is to inflict an injustice upon the creditors and stockholders of the subsidiary to which the debt is shifted. It is a type of mismanagement of a subsidiary which properly calls the Deep Rock doctrine into operation, causing the subordination of the parent's claim for the amount of the transferred debt.

## V.

The remainder of the $10,565,226.78 claim concerned the advances made by MOP to NOTM to acquire five Texas "feeder" railroad lines at a cost of over $5,500,000.

Comstock's contention in this respect is that the acquisition of these lines was for the sole benefit of MOP and I-GN, rather than for NOTM or the GCL system. Reference is made to a statement of the Interstate Commerce Commission that these "feeder" lines "were really acquired for the benefit of the entire [MOP] system, and . . . they have usually been operated at a deficit since acquisition." *Missouri Pacific R. Co. Reorganization,* 239 I. C. C. 7, 71. Moreover, some of the "feeder" lines are said not to connect at all with the lines of NOTM or its GCL subsidiaries. And it is thought that some of the MOP advances were used to cover operating deficits of the acquired property. Such is the basis of the objection to the recognition of MOP's claim against NOTM for the cost of the "feeder" lines.

There is nothing in the record to support an application of the Deep Rock doctrine to this aspect of MOP's claim. The use of NOTM to acquire subsidiary rail lines which have subsequently been operated at a loss does not necessarily indicate improper action by MOP; a mere mistake in business judgment may be all that was involved. And the fact that the acquisition may have been primarily for the benefit of some part of the MOP system other than the GCL companies does not necessarily mean that the

acquisition was outside the legitimate scope of the functions of NOTM, a holding company in the MOP system.

Indeed, the main thrust of Comstock's objection to this segment of the MOP claim is directed toward the entire history of MOP's management of NOTM. The thought is that the relationship of the parent and the subsidiary has been so complex and so saturated with mismanagement as to warrant subordination of the entire claim of the parent without bothering to differentiate between particular transactions. See *Taylor* v. *Standard Gas Co., supra,* 323. But the record does not support such an approach to the MOP-NOTM relationship. There have been, as we have seen, two examples of mismanagement on MOP's part that warrant the application of the Deep Rock doctrine. But those situations are separable in nature from the other transactions between MOP and NOTM. And the Deep Rock doctrine is not one that operates to bar an entire parental claim if only a separable portion of it is inequitable. It is only where, as in the *Taylor* case, the parent-subsidiary relationship has been so complex that it is impossible to restore the subsidiary to the position it would have been in but for the parent's mismanagement that the entire claim may be subordinated without distinguishing the good transactions from the bad. Such is not the situation in this case.

## VI.

From the findings of the District Court and the uncontested facts in the record, I can only conclude that of the $10,565,226.78 MOP claim, the portion of the $2,795,000 relating to dividend advances during the period in question and the $1,261,009.84 relating to the intercompany bookkeeping transaction should be subordinated to the claims of the pledgees of NOTM stock. In holding otherwise, the District Court committed an error which this Court should not overlook.